546 P.2d 1126

**In the Matter of a Member of the State Bar of Arizona, Horace L. LURIE, Respondent.**

**No. SB–73.**

Supreme Court of Arizona, In Banc.

March 16, 1976.

Arthur E. Romley, Phoenix, for State Bar of Arizona.

Marvin Johnson, P. C., Phoenix, for respondent.

CAMERON, Chief Justice.

Respondent, Horace L. Lurie, was charged with unethical conduct. After hearing the Local Administrative Committee found respondent guilty of unethical conduct and recommended suspension from the practice of the law for six months. These findings of fact and recommendations were affirmed and adopted by the Board of Governors of the State Bar of Arizona. Respondent timely objected in this court to the said findings and recommendations.

We must determine whether the respondent misappropriated funds entrusted to him as secretary-treasurer of a closed corporation.

The purpose of discipline is to protect the public and not to punish the attorney. *In Re Moore*, 110 Ariz. 312, 518 P.2d 562 (1974); *In Re Kastensmith*, 101 Ariz. 291, 419 P.2d 75 (1966). Evidence of professional misconduct must be clear and convincing and need not be beyond a reasonable doubt. *In Re Moore*, supra; *In Re Wilson*, 106 Ariz. 34, 470 P. 2d 441 (1970). While it is the duty of the Supreme Court to make an independent determination of the facts from the record, *In Re Johnson*, 106 Ariz. 73, 471 P.2d 269 (1970); *In Re Wilson*, supra, we will nevertheless give serious consideration to the recommendations of the Board of Governors of the State Bar of Arizona, *In Re Brown*, 101 Ariz. 178, 416 P.2d 975 (1966), as well as the findings and recommendations of the local administrative committee. This is especially true when the determination of ultimate facts rests on the weight and credibility of witnesses who have testified in person before that committee. While we cannot avoid the responsibility of determining ultimate facts in disciplinary proceedings, the court is still restricted to the cold record before it and the lo-

cal administrative committee who heard the witnesses testify and observed their demeanor, as well as the Board of Governors who heard the respondent and were able to question him, are in a superior position to determine the credibility of those witnesses who appeared in person.

The facts are strongly contested. In the fall of 1967, the respondent, together with Arlen Wisseman and Donald Potter, formed the VelMir Corporation, an Arizona corporation, for the purpose of acquiring ownership of the Pony Soldier Motel in Kingman, Arizona. The motel was in financial difficulties and it was contemplated that it would be foreclosed by the mortgage holder and that the VelMir Corporation would be in a position to step in, assume the mortgage, and operate the motel. For the purpose of going into this business venture, Mr. Wisseman and Mr. Potter each contributed the amount of $5,000 for a one-third share of the stock. According to Wisseman and Potter, the respondent was to contribute 1,000 shares of stock with a value of $5,000 for a one-third interest. Respondent maintains that this was a loan to the corporation whereas Potter and Wisseman contend that it was a contribution to the capital of the corporation. Respondent also contends that there was an agreement among the incorporators that he would contribute his services as an attorney in lieu of a capital contribution.

The VelMir Corporation was successful in acquiring the ownership of the Pony Soldier Motel in 1970 and the respondent performed services as an attorney in the acquisition of that motel. He also took over the handling of the financial affairs of the VelMir Corporation including all bookkeeping for the corporation. Respondent claims he was in effect running the motel while the other parties contend that respondent only kept the books while they were responsible for the day to day operation of the motel. In any event, respondent had control of the funds of the motel operation. He was the custodian of the funds of the corporation and was autho-

rized to write checks on the bank accounts. Between May of 1970 and August of 1971, respondent caused numerous checks to be drawn upon the account of the VelMir Corporation. According to respondent, the following checks were drawn in respondent's favor for the following purposes:

| | |
|---|---|
| $600 | loan advance for opening expenses |
| $50 | travel to closing |
| $1,000 | loan |
| $1,000 | loan |
| $1,000 | loan |
| $1,000 | loan |
| $1,500 | loan |
| $1,000 | for attorney's fees |
| $300 | for attorney's fees |
| $344.24 | to Skyline Distributing Company |
| $1,320.96 | to Skyline Distributing Company |

The two checks to the Skyline Distributing Company were for a washer delivered to a relative or friend in Phoenix and a stove and refrigerator for respondent's house in Phoenix. These matters were billed to the motel. The amounts of $1,000 and $300 were for unbilled attorney's fees. The amount of $1,500, described as a loan, was used to pay off a debt of respondent owed to the Arizona Bank.

After Wisseman and Potter discovered these withdrawals, they negotiated to buy respondent out which was done even though it is admitted that the purchase price has not been fully paid. Potter testified:

"Q. * * * Prior to the time that you saw the checks which are Exhibit 3, did you have any knowledge of their existence?

"A. No, sir.

"Q. Were those checks authorized by you?

"A. No, sir.

"Q. Were they prepared or drawn with your knowledge or consent?

"A. No, sir.

"Q. Mr. Potter, there is one question that has arisen several times this evening, and that relates to the fact that you and Mr. Wisseman went ahead and purchased Mr. Lurie's interest with at least a suspicion

that something was wrong, and the question that has arisen more than once is why did you go ahead with the purchase when you had these suspicions?

"A. Well, in my own mind, I would say the reason that I agreed to was that if we had a partner that we were in doubt of, we'd be better off to buy him out and then have the control within our own—within the two bodies.

"Q. You were willing to pay to acquire control even though you suspected that Mr. Lurie may have not handled the books properly; is that correct?

"A. That is right."

The complaint of the State Bar alleged:

"That while acting in the dual capacity of lawyer, representing VelMir Corporation, an Arizona corporation, and, concurrently as secretary-treasurer of said corporation, you did, without authorization, and without the advance knowledge of the other officers, directors and stockholders of said corporation, and without any other later ratification by them, use the funds of said corporation for your private and personal benefit.

"The foregoing acts are in violation of some or all of the following rules from the Code of Professional Responsibility for Lawyers as adopted by the Arizona Supreme Court; DR 1–102(A), DR 9–102(A) and (B)."

After hearing the committee found:

"6. After the acquisition of the Pony Soldier Motel respondent, with the consent of Mr. Potter and Mr. Wisseman, took over the handling of the financial affairs of the VelMir Corporation and the bookkeeping for the corporation. He also became the custodian of the checkbooks of the corporation as to checking accounts at the Arizona Bank and the Great Western Bank. He was authorized to write checks on the corporation accounts at both banks.

\*   \*   \*   \*   \*   \*

"8. Neither VelMir Corporation nor Mr. Wisseman or Mr. Potter authorized respondent to use corporate funds for personal purposes.

\*   \*   \*   \*   \*   \*

"15. It is clear to this committee that the respondent used corporate funds for his personal benefit without any authorization to do so. In partial mitigation, the committee notes that Mr. Wisseman testified to some knowledge that respondent had issued checks to himself, marking the stubs 'loan' before the agreement of October, 1971 was made.

### FINDING

"The committee finds that the respondent, while acting in the dual capacity of secretary-treasurer of the VelMir Corporation and as attorney for said corporation engaged in unprofessional and unethical conduct in violation of the Code of Professional Responsibility and of Rule 29(a) and (b), Rules of the Supreme Court, and Canon 1 and Disciplinary Rule 1–102, Section (A), Subsection (4), and Canon 9 and Disciplinary Rule 9–102(A) and (B).

### RECOMMENDATION

"That Respondent HORACE L. LURIE be suspended from the practice of law for a period of six (6) months."

The Board of Governors affirmed the findings and recommendations to which the respondent timely objected in this court.

██ Respondent first contends that he was not acting in the capacity of an attorney, but merely as a fellow-businessman along with the other two parties. We state at the outset that it makes no difference whether he was acting as an attorney or as a businessman. There is nothing to prevent an attorney from engaging in business or other activities, but when he does

so he does not abandon his professional ethics if he wishes to remain a member of his profession. We have stated:

"It should be noted that we are dealing with a situation involving *nonprofessional misconduct* by respondent, i. e., there is no evidence that respondent was ever employed by complainant Ruth G. Marks as her attorney, nor was any attorney's fee ever paid to him by her or anyone else in connection with this hotel venture. It is significant that neither the Administrative Committee nor the Board of Governors expressly found the relationship of attorney-client to exist. However, it does not follow that respondent is thereby immune to disciplinary action when he has violated either the canons of professional ethics or a positive rule of court. Para. 4 of Rule 29(b), supra, expressly provides that disciplinary action may be taken for *'any action or omission, either related or unrelated to the practice of law'* * * *." *In Re Zussman,* 86 Ariz. 272, 274, 344 P.2d 1021, 1023 (1959).

And the Oregon court has stated:

"We may say we are not impressed with petitioner's assertion suggestive of a dual personality; the one a man of business and finance, the other, and apparently a secondary concept, a lawyer. How it may be argued that in the capacity of business man he may indulge in practices generally condemned with reference to attorney and client relationships, when the circumstances show such intimate relationship as to make the two practically inseparable, we do not know.

"When an attorney so intermingles these two aspects of his livelihood, promoting each by reliance upon the other, he cannot escape responsibility for conduct by averring he was acting in his business capacity and that his actions are to be evaluated and judged by the standards of the competition of the market place, rather than by those of his profession.

*Law is not a business. It is a learned profession.* Under the facts of this case there is no cleavage or separation of responsibility for petitioner's acts as a business man and as a lawyer. He may not employ and accept the benefits of such intermingling of activity involving both law and business without assuming responsibility for both. * * *" *In Re Heider,* 217 Or. 134, 159, 341 P.2d 1107, 1118 (1959).

That the respondent may have been acting not as an attorney but as a businessman or investor is no defense to the charge of unprofessional conduct. An attorney may engage in other activities separate and apart from his legal profession, and he may, as here, be an attorney and a businessman at the same time. He may not, however, abandon his professional ethics when he enters the marketplace without jeopardy to his professional standing.

Respondent next contends that he was merely taking these funds from the corporate account to satisfy legitimate loans and set-offs against charges he had against the corporation. Respondent has been consistent in this position and has contested any allegation to the contrary throughout the entire proceedings. We have read the complete transcript and looked at the exhibits in this case. We do not feel that under the circumstances the respondent acted within the highest standards of his profession. He was entrusted with the funds of the corporation. He took those funds and applied them to his own use without the knowledge of the other two principals of the corporation. His excuse now is that he either borrowed the funds or that they were to off set other funds which were already due him. We do not believe that this is the kind of conduct upon which business associates can rely and the bar can view with pride.

We therefore uphold the findings of the committee as affirmed by the Board of Governors and the punishment imposed therein.

STRUCKMEYER, V. C. J., HAYS and HOLOHAN, JJ., and HENRY S. STEVENS, Judge, Retired, concur.

NOTE: This matter was taken under advisement prior to Judge STEVENS' retirement.