630 P.2d 1020
**In the Matter of a Member of the State Bar of Arizona, John F. SWARTZ, Respondent.**

**No. SB–72–2.**

Supreme Court of Arizona,
In Banc.

June 15, 1981.

John S. Hobbs, Phoenix, State Bar Counsel.

Jack C. Cavness, Phoenix, for respondent.

GORDON, Justice:

Respondent-attorney John F. Swartz was charged with unethical conduct in a formal complaint dated March 23, 1979. The Local Administrative Committee found respondent to have violated Disciplinary Rules 1–102(A)(4)[1] and 7–102(A)(3)[2] and recommended that he be suspended from the practice of law for a period of six months. The findings and recommendations of the Committee were approved by the Disciplinary Board of the State Bar of Arizona on a vote of six in favor and one opposed. Respondent objected to the action of the Disciplinary Board, and the matter is now before this Court pursuant to Rule 37, Rules of the Supreme Court, 17A A.R.S.

In the early 1960's respondent was one of a number of purchasers of the Denny Ranch, a cattle ranch in Arizona consisting of approximately 47,000 acres in Mohave, Coconino and Yavapai Counties. The fifteen or sixteen co-purchasers resided in Michigan, California, Florida and Arizona and owned various percentages of the property due to differences in their investments. Each had been induced by respondent to invest in the Denny Ranch purchase and each had been assured by respondent that he personally would guarantee that they would not suffer financially for having made the investment. Because of this assurance, respondent bought out several investors, resulting in respondent and his brother increasing their investment to an undivided 18% ownership each in the property.

A Mr. Regorrah of Detroit at one time owned a 25% interest in the ranch. After Regorrah died in 1969, his interest passed to the Regorrah Trust, which was represented by Mr. David Raitt, an attorney in Detroit, Michigan. At least 25% of the remaining ownership interests were held by Phoenix investors who were informally represented by Phillip Marr.

Respondent acted as attorney in fact for his fellow investors, including the Regorrah Trust, in connection with their sale of the ranch. The agreement concerning his authority to act on the investors' behalf was that he was to handle the sale in ways which met with the approval of those who owned a majority interest in the ranch. Respondent testified that when a matter needed to be decided, he would contact everyone who owned an interest in the property, if possible, and abide by the decision of those in the majority in ownership. Most decisions were made by respondent after contacting Mr. Marr, because the consensus of over 50% of the ownership in the ranch could be obtained through the agreement of respondent and his brother, who together owned 36% of the ranch, and Mr. Marr, who represented 25% or more of the investors.

---

**1.** "DR 1–102. Misconduct

"(A) A lawyer shall not:

\*  \*  \*  \*  \*  \*

"(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

**2.** "DR 7–102. Representing a Client Within the Bounds of the Law

"(A) In his representation of a client, a lawyer shall not:

\*  \*  \*  \*  \*  \*

"(3) Conceal or knowingly fail to disclose that which he is required by law to reveal."

In early 1972 the investors in the ranch received an offer from a Mr. Albert Burke, a real estate broker, who was previously known by respondent, to purchase the Denny Ranch for the sum of $4,700,000 with $10,000 payable at the close of escrow and the balance to be paid in varying installments beginning on April 19, 1973. Pursuant to respondent's authority as attorney in fact, an escrow was established for the sale to Burke. The escrow closed on June 13, 1972, with Burke having nominated the Albert Burke Corporation as the buyer.

One of the terms of the escrow instructions provided that Foster Mori, Burke's attorney, would receive 9% of the purchase price as attorney's fees, and that respondent would receive 1% of the purchase price as attorney's fees. It is undisputed that all co-investors-sellers, including the Regorrah Trust, were aware of these provisions and understood that the 9% referred to as Mori's attorney's fees was in actuality a reduction of the purchase price of the ranch or a rebate in favor of Burke. Mori testified that his arrangement with Burke was that he would collect the 9% and hold it for him, because at the time of the establishment of the escrow Burke had not yet decided whether to treat this sum as a real estate commission or a lower cost base for the property, which depended on how he would later develop or sell the ranch.

Prior to the close of escrow, the preliminary title report showed that it was not possible to convey clear title to Burke or his corporation because of the existence of certain timber and mineral reservations outstanding on the property in favor of a third party. In order to get the buyer to waive these defects in title, respondent, acting on his own behalf and also on behalf of his co-investors, agreed by letter dated June 13, 1972, to use every effort to get the reservations removed before September 30, 1972, and, if unsuccessful, to allow the buyer to elect to either rescind the sale with full refund or have the purchase price of the ranch reduced by $1,000,000. This agreement evidently satisfied Burke as his corporation allowed the escrow to close, which had the effect of saving the sale.

Within a year or two after the close of escrow the sale developed problems. Burke's corporation was in default in its first installment payment and, because a subdivision plat had been recorded on the ranch, the real estate taxes had increased from $4,000 per year on the ranch to $100,000 per year. It appeared to respondent at this point as though the deal was going to fall through and the sellers would have to cancel the sale and repossess the ranch with the attendant increased tax obligations. This result would be costly to respondent both as a repossessing owner and as an indemnitor who would be called upon to make good on his promise to reimburse his co-investors. At this stage, acting for himself and his co-investors, respondent amended the sale agreement allowing more desirable parcels to be sold earlier by Burke.

Thereafter, some sales were made by the Burke corporation to individual purchasers, and upon the closing of these sales some small amounts of money were sent to Mori by virtue of the escrow instruction that he receive the 9% attorney's fee. After consulting with Burke, Mori deposited these amounts in his trust account.

Respondent and Burke then agreed to a change in the status of the 9% attorney's fees to be received by Mori in order to, as respondent explains it, give some additional protection to himself and to his co-investors to secure Burke's performance. Respondent convinced Burke to hold the funds that were accruing to Burke's benefit in Mori's trust account to secure respondent and his co-investors until approximately $1,000,000 worth of property had been sold to third parties. What respondent got Burke to agree to do was to not use the money which was accruing through this source until a minimum amount of sales had occurred. Because respondent and Burke were friends, Burke agreed to this and advised Mori to hold these funds subject to respondent's directions. To achieve this result, rather than notifying the title company of a change in the escrow instructions or the agreement of sale, Mori prepared the following document:

"DECLARATION OF TRUST

"The undersigned does hereby declare that the 9% commission payable to the undersigned under the terms of Escrow No. 104138 with Title Insurance Company of Minnesota or the commissions payable to the undersigned under the terms of Trust Nos. 591 or 592 are in fact being received by the undersigned as trustee for the full use and benefit of John M. Swartz.

"It is hereby acknowledged that the right of the trustee to receive said commissions is subject to the instructions of John M. Swartz and that such sums shall be collected and/or distributed strictly in accordance with such instructions.

"In the event of the death of John M. Swartz, the right to receive said commissions shall be assigned and transferred to the Estate of John M. Swartz.

"In the event of the death of the undersigned, all rights to said commissions shall revert to John M. Swartz with full power to substitute trustee.

"IN WITNESS WHEREOF, the undersigned does hereby set his hand and seal this 19th day of June, 1973.

[signature]
FOSTER G. MORI"

Mori testified that the instructions as to the distribution of the trust in the event of the death of himself or Swartz were inserted strictly for his (Mori's) own protection.

Respondent was aware of the existence of the Declaration of Trust but at no time requested the distribution of any funds therefrom to himself. For almost two years after June 1973, Mori continued to collect and hold for Burke the monies being paid from the escrow which under the terms of the trust were subject to the control of Swartz. Approximately fourteen to sixteen thousand dollars accumulated in the fund over this time, with portions thereof being paid to Mori as attorney's fees for removing the mineral and timber reservations on the property. At Burke's direction all of the contents of the trust fund were given to a subsequent buyer of the property in a later sale of the ranch.

In October 1972 Mori placed the amount then in his trust account in a savings account in San Diego, California, with respondent being a signatory on the passbook. Respondent explained this as being the result of a discussion he had with Mori about problems that Mori had had in his marriage dissolution when his wife had made claims on a similar trust account in which she believed Mori had a beneficial interest. The amount in the San Diego savings account was returned to Mori's trust account in June 1973, without any interim withdrawals.

Soon after the creation of this trust, respondent brought his brother and Mr. Marr up to date as to the change in function of the 9% attorney's fees provision. Respondent did not, however, advise or contact Mr. Raitt of the Regorrah Trust. Mr. Raitt became aware of the existence of the trust account and the declaration of trust through an independent source some two years later. At that time, he became concerned and requested an explanation from respondent. Respondent furnished Raitt with an explanation of his position regarding the trust funds, although the funds had prior to Raitt's inquiry been paid over to the ultimate buyers of the property by Mori, at Burke's request and with respondent's approval. Burke testified that this was done because the defaults had been rectified and new purchasers had been brought into the sale.

It is undisputed that all problems that came up in the Denny Ranch sale were ultimately worked out to everyone's satisfaction and that no co-investor was in any way financially harmed by the maneuvers concerning the 9% attorney's fees. The funds coming from that item were ultimately paid in the manner originally contemplated by all the parties, including the Regorrah Trust.

The formal complaint filed with the State Bar in this matter contained four counts. Count I related to an entirely distinct matter, Emma Brown and her motel property. Although evidence was taken relating to

this count, no findings, conclusions or recommendations were made by either the Local Administrative Committee or the Disciplinary Board concerning it. For this reason Count I is deemed dismissed.

Counts II, III, and IV all alleged improper conduct on respondent's part in dealings as an attorney at law and an attorney in fact on behalf of co-investors in the sale of the Denny Ranch. Neither the Local Administrative Committee nor the Disciplinary Board made any findings, conclusions or recommendations concerning Counts III or IV. Therefore, these counts are also deemed dismissed by this Court.

The remaining Count II of the formal complaint reads as follows:

"That you have violated the Code of Professional Responsibility, specifically Disciplinary Rule 7–103(A)(3) [sic], in that while acting as a fiduciary as attorney-in-fact and attorney at law for other persons who were co-purchasers with you of certain real property known as the DENNY RANCH, you concealed from your co-purchasers in connection with a sale of the said DENNY RANCH, facts which you should have disclosed to them, which facts were that you were collecting via Declaration of Trust executed by Foster G. Mori, Attorney at Law, a nine percent (9%) commission on the said [sic] of the said DENNY RANCH."

Respondent raises the following questions:

(1) Can respondent be convicted of ethical violations with which he was not charged?

(2) Can a finding of an ethical violation be based upon facts different from those alleged in the formal complaint?

(3) Is the conclusion that respondent violated any disciplinary rules supported by the evidence?

(4) Is the punishment recommended by the Committee and the Board appropriate?

■ As to the first two questions respondent points out that, although the formal complaint did not charge him with a violation of DR 1–102(A)(4), the Local Ad-

ministrative Committee found that he had violated both DR 1–102(A)(4) and DR 7–102(A)(3). Respondent contends that procedural due process was violated by the Committee's finding that he was guilty of an ethical violation with which he had not been charged in the formal complaint.

In support of his position, respondent cites *In re Ruffalo,* 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968); *Kelson v. State Bar of California,* 17 Cal.3d 1, 549 P.2d 861, 130 Cal.Rptr. 29 (1976); and *Mendicino v. Whitchurch,* 565 P.2d 460 (Wyo.1977). These cases stand for the proposition that an attempt by the State Bar to amend its formal complaint to include additional charges of misconduct based on testimony given before the local administrative committee in response to the original charges against respondent would violate procedural due process.

*Ruffalo, supra,* involved a bar disciplinary matter in which a lawyer had given certain testimony in the belief that it constituted a defense to some of the charges brought against him. On the basis of his testimony, the State Bar brought an additional charge against the lawyer. The Supreme Court held that the bringing of the additional charges based on the lawyer's testimony violated due process, explaining that proceedings "become a trap when, after they are underway, the charges are amended on the basis of testimony of the accused." 390 U.S. at 551, 88 S.Ct. at 1226, 20 L.Ed.2d at 122. The Court held, "This absence of fair notice as to the reach of the grievance procedure and the precise nature of the charges deprived petitioner of procedural due process." *Id.* at 552, 88 S.Ct. at 1226, 20 L.Ed.2d at 123.

Similarly, the California Supreme Court held in *Kelson, supra,* that it was a violation of procedural due process for the State Bar to attempt to amend its charges in a disciplinary matter on the basis of the accused attorney's testimony without having given that attorney notice of the charge and an opportunity to respond. And in *Whitchurch, supra,* the Wyoming Supreme Court

indicated that if the State Bar felt that evidence brought up by an accused attorney in a disciplinary proceeding constituted an additional basis for disciplinary action, that evidence should be the subject of a separate charge, requiring notice and hearing.

All three of these cases concerned additional charges levied against lawyers as to separate incidents of misconduct on the basis of testimony which had been presented in bar disciplinary proceedings in response to original charges of misconduct. In the case before us, no separate incidents of misconduct have been alleged. The finding of a violation of DR 1–102(A)(4) was based on the same conduct described as a violation of DR 7–102(A)(3) in Count II: concealing from co-purchasers facts which respondent, acting as a fiduciary for those co-purchasers, should have disclosed to them, specifically, that he was collecting via a declaration of trust a 9% commission on the sale of the ranch.

Under these circumstances, the finding of a violation of DR 1–102(A)(4) when a violation of DR 7–102(A)(3) had been specified in the Formal Complaint would be similar to the finding of a lesser included offense upon an indictment or information in criminal law. Rule 13.2(c), 17 A.R.S. Rules of Criminal Procedure, provides: "Specification of an offense in an indictment or information shall constitute a charge of that offense and of all offenses necessarily included therein."[3]  Here respondent was charged basically with not disclosing something which he was required to reveal. Although his failure to disclose may not have been a violation of DR 7–102(A)(3) because it was not perpetrated by him while acting as a lawyer in the representation of his client, the State Bar did not err in finding that his nondisclosure was a violation of DR 1–102(A)(4).

We agree that due process in bar disciplinary proceedings requires that a respondent be given fair notice of the charges against him. This includes a reasonably definite statement of those charges, see In re Levine, 97 Ariz. 88, 397 P.2d 205 (1964), which we believe was provided by the allegations in Count II. While DR 7–102(A)(3) was designated as the specific provision of the Code of Professional Responsibility which respondent was charged with having violated, we feel that Count II served as fair notice to Swartz that he could also be found guilty of having violated DR 1–102(A)(4).

As to the third question, in order to determine whether there is sufficient evidence to support the conclusion that respondent violated any disciplinary rules, we are guided by the following principles: Evidence of professional misconduct must be clear and convincing, although it need not be beyond a reasonable doubt. In re Wilson, 106 Ariz. 34, 470 P.2d 441 (1970). While it is the duty of the Supreme Court to make an independent determination of the facts from the record, In re Carroll, 124 Ariz. 80, 602 P.2d 461 (1979), we will nevertheless give serious consideration to the findings and recommendations of the Disciplinary Board and the Local Administrative Committee, In re Lurie, 113 Ariz. 95, 546 P.2d 1126 (1976).

Further, the fact that respondent may have been acting as a businessman or investor instead of a lawyer is no defense to a charge of unprofessional conduct. Lurie, supra. "As long as a lawyer is engaged in the practice of law, he is bound by the ethical requirements of that profession, and he may not defend his actions by contending that he was engaged in some other kind of professional activity." In re Dwight, 117 Ariz. 407, 410, 573 P.2d 481, 484 (1977).

There is little dispute in the evidence as to what happened in this matter, and we believe the proof is clear and convincing that respondent violated DR 1–102(A)(4) in that he failed to notify the Regorrah Trust of the change in status of

---

**3.**  Rule 23.3, 17 A.R.S. Rules of Criminal Procedure, adds,

"Forms of verdicts shall be submitted to the jury for all offenses necessarily included in the offense charged, an attempt to commit the offense charged or an offense necessarily included therein, if such attempt is an offense."

the 9% designated as Mori's attorney's fees to an account controlled by respondent for almost two years.

Although there is scant evidence that respondent performed any valuable services for his co-investors as an attorney at law, he testified that he acted as attorney in fact for the group. As their attorney in fact, respondent was an agent for his co-investors, *Delos v. Farmers Ins. Group, Inc.*, 93 Cal.App.3d 642, 155 Cal.Rptr. 843 (1979), and had fiduciary responsibilities to them as his principals, *Valley Nat'l Bank of Phoenix v. Milmoe*, 74 Ariz. 290, 248 P.2d 740 (1952); 3 Am.Jur. *Agency* § 199 (1962). This agency extended throughout the negotiations for, the execution of and the supervision of the performance of the agreement for the sale of the Denny Ranch.

As an agent with fiduciary duties to his co-investors, respondent owed them the obligation of fully disclosing all material facts concerning the sale of the Denny Ranch. *Batson v. Strehlow*, 68 Cal.2d 662, 441 P.2d 101, 68 Cal.Rptr. 589 (1968); Restatement (Second) of Agency § 381 (1958). "The duty of an agent to make full disclosure to his principal of all material facts relevant to the agency is fundamental to the fiduciary relation of principal and agent." 3 Am.Jur. *Agency* § 200 (1962). Respondent breached this duty of disclosure by failing to disclose to the Regorrah Trust the change in status of the 9% fund.

It is entirely possible that respondent did not overstep his authority to act as attorney in fact for the group when he altered the status of the 9% attorney's fees provision of the agreement, as he had the authority of a majority of the interests of the property owners either before he did so or by their ratification thereafter. But this does not excuse his not advising the Regorrah Trust that such a change had been made, as the Regorrah Trust had every reason to believe that the funds being paid under this provision were being paid to Burke through Mori. Contrary to that belief, for a period of approximately two years, these funds were being placed into an account controlled by respondent for dual purposes: (1)

to protect his co-investors and (2) to serve as a fund to secure respondent personally in case he had to make good on his indemnity to his co-investors. The fact that his co-investors were ultimately not harmed by these maneuvers is irrelevant to the fact that not all were advised as to what was happening, as a principal should have the right to refute or disavow the conduct of his agent.

DR 1–102(A)(4), quoted in footnote 1, proscribes conduct by a lawyer involving dishonesty, fraud, deceit, or misrepresentation. Our cases have held that the breach of a fiduciary duty by an agent constitutes fraud. *Morrison v. Acton*, 68 Ariz. 27, 198 P.2d 590 (1948); *In re McDonnell's Estate*, 65 Ariz. 248, 179 P.2d 238 (1947); *In re Chandos*, 18 Ariz.App. 583, 504 P.2d 524 (1972); *In re Purton*, 7 Ariz.App. 526, 441 P.2d 561 (1968); *see Lehnhardt v. City of Phoenix*, 105 Ariz. 142, 460 P.2d 637 (1969); *Hassenpflug v. Jones*, 84 Ariz. 33, 323 P.2d 296 (1958). Respondent freely admitted that he failed to disclose the change in status of the 9% fund to the Regorrah Trust. By this breach of his fiduciary duty to disclose, respondent "[e]ngage[d] in conduct involving * * * fraud."

We feel, therefore, that there is sufficient evidence to support the conclusion of the Local Administrative Committee that respondent violated DR 1–102(A)(4).

■ As to the fourth question, the Disciplinary Board recommended that respondent be suspended from the practice of law for a period of six months. In the regulation of attorneys, the primary concern of this Court is protection of the public from incompetent or unscrupulous acts of practitioners. *Lurie, supra; In re Moore*, 110 Ariz. 312, 518 P.2d 562 (1974). Respondent violated a legal duty of disclosure, but the evidence is not clear and convincing that he did it either because he was incapable or for his own enrichment. It is doubtful that these proceedings would have occurred if a straightforward modification of the escrow instructions had been made at the time the parties desired to change the status of the 9% attorney's fees. For these reasons, and

because this matter has been pending in one form or another since 1975, we believe that censure is the appropriate sanction.

It is therefore ordered that the respondent, John F. Swartz, be and is hereby censured. It is further ordered that within thirty days of the issuance of this mandate respondent pay costs in the sum of $785.02 pursuant to Rule 37(g), 17A A.R.S., Rules of the Supreme Court.

STRUCKMEYER, C. J., HOLOHAN, V. C. J., and HAYS and CAMERON, JJ., concur.