686 P.2d 1236

**In the Matter of a Member of the State Bar of Arizona, John F. SWARTZ, Respondent.**

**No. SB–72–3.**

Supreme Court of Arizona, En Banc.

July 10, 1984.

---

Jack C. Cavness, Phoenix, for respondent.

FELDMAN, Justice.

A Local Administrative Committee (Committee) of the State Bar of Arizona filed a complaint on September 8, 1981, alleging that John F. Swartz (respondent) violated Disciplinary Rule 2–106, Code of Professional Responsibility, and Rule 29(b)(1) of the Rules of the Arizona Supreme Court, 17A A.R.S.[1], by charging a clearly excessive fee. In an amended complaint, the Committee charged that respondent's conduct also violated, *inter alia*, DR 1–102(A)(5) (conduct prejudicial to the administration of justice).

The Committee held hearings on three separate dates, ending in February, 1982. It concluded that respondent had violated DR 2–106(A) by charging and collecting a clearly excessive fee for the "total representation" of his client. Finding that respondent had attempted to maximize his fee at his client's expense, the Committee further concluded that respondent had violated DR 1–102(A)(5) by consciously and willfully taking advantage of the system for handling third party tort claims of injured workers who have sought benefits under the workmen's compensation system. A majority of the Committee recommended that respondent be suspended from practice.

Respondent objected to the Committee's findings, conclusions and recommendation. The State Bar Disciplinary Board (Board) reviewed the matter and voted to accept the Committee's findings and conclusions, but modified the disciplinary recommendation of the Committee. Respondent objected to the Board's recommendation and the matter was then filed with this court. We have jurisdiction pursuant to Rules 36(d) and 37.

## FACTS

Steven Sarge was injured in a work-related accident on September 7, 1979 when he

Stephen L. Weiss, Phoenix, for State Bar.

1. The Rules of the Supreme Court, 17A A.R.S., will hereafter be referred to as "Rule ___." Those Rules incorporate the Disciplinary Rules (DR) promulgated by the American Bar Association as part of the Code of Professional Responsibility (Code), Rule 29(a).

was hit by a car while setting barricades on the Black Canyon Freeway. Sarge sustained severe, multiple injuries; one leg eventually was amputated. Between September 7 and 13, while Sarge was in intensive care, respondent met with Sarge's mother and brother in the hospital room. They retained respondent to represent Sarge with respect to both a workmen's compensation claim and a personal injury claim against the responsible driver.

A.R.S. § 23–1023 permits an injured worker to follow parallel remedies. He may file a workmen's compensation claim and may, while receiving benefits, pursue a tort claim against any person (other than his employer or a co-employee) legally responsible for the injury. Such tort claims are sometimes described as "third party claims." The industrial carrier (in this case the State Compensation Fund (Fund)) is given a lien against the net recovery on the third party claim for the amount of past benefits paid the injured worker. A.R.S. § 23–1023(C). Any net recovery in excess of the lien is retained by the injured worker, but is to be offset against future benefits which the worker would otherwise receive from the industrial carrier. *Id.* Thus, if there is no reasonable chance that the net tort recovery will exceed attorney's fees, costs, the workmen's compensation lien and the credit for future benefits, there is no advantage in bringing the tort action, because none of the recovery would inure to the worker's benefit. An exception exists if the attorney for the worker can persuade the industrial carrier to reduce its lien, thus reducing the "nut" which the worker must meet before he may pocket any recovery. According to the evidence, one of the factors the Fund considers in determining whether to reduce its lien claim is a reduction in the amount of the fee to be charged by the attorney for the injured worker.

Sarge was seriously incapacitated and respondent appropriately established a conservatorship on November 1, 1979. On that date a written fee agreement for the tort claim was made with Sarge's mother and brother; it called for respondent to represent Sarge for a fee equal to one-third of all sums recovered.

The facts surrounding the accident were not disputed. The driver of the vehicle which struck Sarge had been intoxicated. No real defense existed and liability was clear. Punitive damages may have been recoverable. Sarge's injuries were extensive. Although a coverage issue was raised at first, it was soon abandoned, and there was no serious dispute concerning insurance coverage. In fact, the driver was covered by two separate policies,[2] with respective limits of $100,000 and $50,000. Aside from these two policies, there were no significant assets subject to execution or garnishment. Two weeks after respondent entered into the contingent fee agreement, one of the liability carriers offered to pay its $100,000 policy limit; approximately two months later, the second carrier offered its policy limit of $50,000. These settlements were made after minimal negotiation between respondent and representatives of the insurance carriers. It was not necessary for respondent to file the tort action and none was ever filed. Although respondent kept no time records, he testified that effecting the settlement had involved a "tremendous amount of work." A qualified expert witness called by bar counsel reviewed the files of all parties and estimated that respondent could not have spent more than twenty to thirty hours in handling all aspects of the claim.

By the time settlement was achieved it had become clear that the Fund's liability for payment of workmen's compensation benefits, and therefore its statutory lien, would soon exceed the net recovery to Sarge. In fact, at the time the settlement with the insurance carriers was consummated, the Fund's total lien was approximately $90,000. Future benefits payable, reduced to present value, were estimated at

---

**2.** The driver was not the owner of the car. One policy covered the driver; one covered the owner of the car and extended coverage to the permissive driver.

more than $150,000. The proposed settlement distribution was as follows:

| | |
|---|---|
| Gross settlement: | $150,000.00 |
| Attorney's fees (⅓): | 50,000.00 |
| Costs: | 83.20 |
| Net Proceeds: | 99,917.00 |

As required by A.R.S. § 23–1023(C), the settlement was approved by the Fund. It was also approved by the probate court. Payment of the statutory lien in favor of the Fund consummed all but approximately $10,000 of the net proceeds of settlement. After paying almost $90,000 of the net proceeds to the Fund in satisfaction of its lien and disbursing the fee of $50,000 to himself, respondent retained approximately $10,000 in a trust account. This sum was evidently held for payment of accruing medical expenses and the like. These "excess" funds were credited by the Fund against future benefits and constituted an offset against such benefits. From a practical standpoint, the net result of the settlement was that the Fund got $100,000, respondent received the $50,000 fee, and Sarge received nothing.

In addition to the $50,000 fee which respondent charged and collected on the recovery in the tort claim, respondent requested $1,320 and was awarded $350 in fees by the probate court for work done in the conservatorship proceedings. Respondent also charged and collected 15% of the funds which Sarge received on his workmen's compensation claim until such time as Sarge retained other counsel to represent him in connection with that claim. Respondent testified that his normal charge on workmen's compensation proceedings was 25% and that he reduced his fee to 15% because of the fee which he had received in the tort action.

Respondent and Sarge eventually had a disagreement with regard to both the compensation claim and the tort recovery; Sarge retained counsel and a malpractice action against respondent was filed in Mar-

icopa County Superior Court. Summary judgment was granted against Sarge. The record of that action was admitted in evidence at the Committee hearing. In its findings, the Committee indicated that it had given no weight to that record, the results of the action, nor the testimony of the attorney who had represented Sarge in the malpractice action and who respondent called as a witness in the disciplinary proceedings. During respondent's case-in-chief in the disciplinary proceedings, he called a polygraph examiner to testify to the results of a polygraph test given to respondent at his request. The Committee admitted the results in connection with the issue of whether respondent had attempted to negotiate with the Fund toward compromise of its lien.[3] In its findings, the Committee indicated that it had not considered the polygraph results in reaching its decision.

## ISSUES

Respondent contends:

1. He did not charge a clearly excessive fee and the record does not support the conclusion of the Committee that:

Respondent violated DR 2–106(A) by charging and collecting clearly an excessive fee for the total representation of his client.

2. The record does not support the Committee's finding that respondent:

made absolutely no effort to obtain a reduction in the Fund's lien by compromising his attorney's fees or otherwise [with the result that] Sarge personally received nothing from the ... settlement
....

Thus, respondent claims also, the Committee erred in concluding that respondent violated DR 1–102(A)(5) by "consciously and willfully" taking

advantage of the system of allowing attorney's fees for third-party claims in workmen's compensation cases so as to

**3.** The evidence was admitted "conditionally;" the Committee stated they might or might not

consider it in their deliberations.

maximize his owns fees without attempting to obtain any direct monetary benefit to his client.

3. The Committee erred in failing to consider the polygraph examination results in reaching its findings of fact.

4. The Committee erred by disregarding the results of the malpractice action and the testimony of Sarge's attorney.

## STANDARD OF REVIEW

We first note the standard applicable to review of the evidence in disciplinary proceedings. Evidence of misconduct must be clear and convincing in order to support disciplinary action, but need not equal proof beyond a reasonable doubt. *In the Matter of Rubi*, 133 Ariz. 491, 652 P.2d 1014 (1982). It is our duty to make an independent determination of the ultimate facts, though the recommendations, findings of fact and conclusions of the Committee and the Board are entitled to great weight. *In the Matter of Burns*, 139 Ariz. 487, ——, 679 P.2d 510, 515–516 (1984) citing *In the Matter of Lurie*, 113 Ariz. 95, 95–96, 546 P.2d 1126, 1126–27 (1976); *In the Matter of Rubi, supra.* Although this court is the ultimate finder of fact in disciplinary proceedings, the findings and recommendations of the Committee are especially pertinent where the credibility of a witness who testified before the Committee is at issue. *Matter of Burns, supra.*

## WAS THE FEE EXCESSIVE?

DR 2–106 provides that a lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee. It provides, also, that:

(B) A fee is clearly excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee.

So far as relevant to this case, the rule enumerates the following factors "to be considered as guides in determining the reasonableness of a fee":

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

\* \* \* \* \* \*

(3) The fee customarily charged in the locality for similar legal services.

(4) The amount involved and the results obtained.

\* \* \* \* \* \*

(8) Whether the fee is fixed or contingent.

DR 2–106(B).

At the Committee hearing, Bar counsel presented a qualified local attorney who gave expert testimony that the fee collected in the tort proceeding was clearly excessive. In essence, the witness testified that there was no real contingency involved in the case and that the minimal amount of work done by respondent fell far short of justifying the fee collected. The witness stated that under these facts the standard of ethical practice followed in the community would have required the respondent to greatly reduce the fee charged.

Respondent defends the propriety of the fee collected on the ground that a one-third percentage is customary for a personal injury claim in this community. He asserts that until and unless the bench and bar adopt rules regulating the amount of contingent fees, the "one-third contingent fee, which is not dependent upon work done and perhaps other considerations, is the customary fee" and may properly be charged.

We disagree, first, with the contention that appropriate regulations have not been adopted. Legal history indicates the opposite. The contingent fee was originally considered unethical and illegal as a form of champerty. *See* Note, *Lawyer's Tight Rope—Use and Abuse of Fees*, 41 Cornell L.Q., 683, 685–86 (1956); Radin, *Maintenance by Champerty*, 24 Cal.L.Rev. 48 (1935); Radin, *Contingent Fees in California*, 28 Cal.L.Rev. 587, 588 (1940). It is still considered champertous and illegal in most countries, including Great Britain and the Commonwealth nations. *See* Note, *su-*

*pra,* 41 Cornell L.Q. at 685 and authorities cited therein.

Whatever the view in other countries, the contingent fee was long ago recognized in the United States and is approved in nearly all, if not all, jurisdictions. Radin, *supra,* 28 Cal.L.Rev. at 589. That acceptance, however, was "grudging"; the fee was approved because it was considered a "necessary evil." Note, supra at 684–85 n. 20, quoting from Conference of Bar Association Delegates, 5 A.B.A.J. 61 (1918). To paraphrase, what was before disreputable and illegal became lawful, but not respectable. *Rooney v. Second Avenue R.R.,* 18 N.Y. 368, 373 (1858). It has been suggested that the opposition to contingent fees was chiefly based upon the fear that lawyers would speculate (Note, *supra,* at 689), the danger that lawyers with a direct pecuniary interest in a case would be tempted to manufacture or twist evidence, tamper with the process or otherwise act improperly (*id.* at 697) and the fear that lawyers would overreach because of the conflict between the profession's goal of serving the public and their own self interest. *Id.* at 705. There is also the danger, of course, that such a fee arrangement will increase the filing of vexatious and frivolous actions, though it is certainly possible to argue that such actions may as easily be brought by lawyers who receive substantial fees on a traditional basis. Radin, *supra,* 28 Cal.L.Rev. at 589.

Whatever the dangers, it is now generally accepted that the contingent fee is proper and has substantial social utility because such arrangements are "often the only method by which a person of ordinary means may prosecute a just claim to judgment." Note, *supra,* at 689.[4] We believe that social utility strongly favors the contingent fee as a "poor man's door to the

courthouse." Further, given present costs of litigation, we recognize that both the middle class and the wealthy may need or prefer representation on a contingent basis. Properly used, therefore, we believe that the contingent fee is a necessary method of insuring the availability of legal services. Abuses are best handled by control and regulation. In Arizona both the existence and regulation of contingent fees is recognized by our Disciplinary Rules and comments. DR 2–106(B)(8) expressly recognizes that fees may be "fixed or contingent." The Canons of Professional Ethics provide as follows:

> A contract for a contingent fee, where sanctioned by law, should be reasonable under all the circumstances of the case, including the risk and uncertainty of the compensation, but should always be subject to the supervision of the court, as to its reasonableness.

Canon 13, ABA Canons of Professional Ethics.[5]

Thus, contrary to respondent's assertion, the contingent fee is expressly recognized in the rules and is not merely a matter of custom; *see, e.g.,* Ethical Consideration (EC) 2–20. Further, the Disciplinary Rules, adopted as binding rules of conduct, set limits for all fees, fixed and contingent. DR 2–106(B). We have recognized before that collection of clearly excessive contingent fees warrants imposition of discipline. *In the Matter of Mercer,* 126 Ariz. 274, 614 P.2d 816 (1980). The court's inherent power to prevent collection of excessive contingent fees was acknowledged in *Covert v. Randles,* 53 Ariz. 225, 230, 87 P.2d 488, 490 (1939).

■■■■ Contrary to respondent's suggestion, DR 2–106 may be violated even though no court in this state has set any particular percentage as appropriate for

---

4. Most of the countries in which contingent fees are considered unethical and illegal also maintain systems whereby the social problem of serving the poor is solved by appointing lawyers paid from public funds to represent civil litigants who are unable to afford proper representation. *See* Note, *supra,* authority cited at 689 n. 47.

5. While the Canons are not adopted as Rules of Conduct for the profession in Arizona, as are the Disciplinary Rules, they are important for understanding and interpreting the Disciplinary Rules and the obligations of the bench and bar.

contingent fees. It is no more possible to set such percentages in advance than it would be to set a single fixed fee for all divorce cases or all real estate litigation. We hold, therefore, that contingent fees are subject to regulation by this court. Excessive fees should not be charged (ABA Canons of Professional Ethics, Canon 12) and "clearly excessive fees" will constitute grounds for disciplinary action, whether the fee is fixed or contingent. DR 2–106.

Respondent is correct in contending that the one-third contingent fee initially agreed upon was within customary limits for the type of case and was not excessive. We do not believe, however, that recognition of the propriety of the initial fee arrangement gives the lawyer carte blanche to charge the agreed percentage regardless of the circumstances which eventually develop. Either a fixed or contingent fee, proper when contracted for, may later turn out to be excessive. Radin, *supra*, 28 Cal. L.Rev. at 591. We realize that business contracts may be enforced between those in equal bargaining capacities, even though they turn out to be unfair, inequitable or harsh. *Goodman v. Newzona Invest. Co.*, 101 Ariz. 470, 473–474, 421 P.2d 318, 321–322 (1966). However, a fee agreement between lawyer and client is not an ordinary business contract. The profession has both an obligation of public service and duties to clients which transcend ordinary business relationships and prohibit the lawyer from taking advantage of the client. Thus, in fixing and collecting fees the profession must remember that it is "a branch of the administration of justice and not a mere money getting trade." ABA Canons of Professional Ethics, Canon 12. We hold, therefore, that if at the conclusion of a lawyer's services it appears that a fee, which seemed reasonable when agreed upon, has become excessive, the attorney may not stand upon the contract; he must reduce the fee. What is reasonable and within permissible limits will be determined by the circumstances, including the factors listed in DR 2–106.

In the case at bench, we believe that at the time of settlement it was obvious that the agreed fee was unreasonable and clearly excessive. We recognize that a lawyer working on a contingent fee basis may receive a large fee without that fee being excessive. The fee may be much larger than that which the attorney would have received if he had made no agreement and sued for the reasonable value of his services. Radin, *supra*, 28 Cal.L.Rev. at 592. It may be much larger than that attorney or others in the community would have charged had they been retained and paid on a time basis. Such disparity is inherent in the nature of a contingent fee and is, therefore, one of the circumstances to be considered under DR 2–106(B)(8). Nevertheless, also inherent in the nature of the contingent fee is the concept that the share of the recovery to be paid the lawyer as a contingent fee is properly the product of a number of factors, including: 1) the degree of uncertainty or contingency with respect to liability, amount of damages which may be recovered, or the funds available from which to collect any judgment; 2) the difficulty of the case and the skill required to handle it; 3) the time expended in pursuing it; and, 4) the results obtained. In the case at bench there was no contingency or uncertainty as to liability, and it was apparent that the damages would be substantial but recovery limited to the relatively small amount of insurance available. The limits of the insurance policies available were known almost immediately. There was nothing novel or difficult about the case and it was not even necessary to file a legal action. At the most, only thirty hours of time were expended on the case. There was, in short, no contingency, no difficult problem and little work. There was also no result for the client. Under these circumstances, we agree with the Bar's expert that a fee of $50,000 is both clearly excessive and shocking. Had respondent not deducted the fee but attempted to recover it from Sarge by legal action, it would have been the "duty" of this court "to deny a recovery" on the ground that the fee was out of proportion to the servic-

es rendered. *Covert v. Randles, supra.* In dealing with his client, respondent may not be allowed to obtain by self-help what he could not have properly obtained in a court of law. When it became evident that the fee agreed upon was excessive, it became respondent's duty to reduce the agreed fee so that he would charge and collect no more than was reasonable.

Respondent argues, however, that the fee can not be considered excessive because it was approved by both the State Compensation Fund and the Probate Court. We disagree. The evidence showed that such "approvals" are made on a pro forma basis with no real inquiry into the factors that determine whether the fee is reasonable. An arrangement calling for a one-third contingent fee seems reasonable on its face, and may well have been approved, according to the testimony, without real inquiry.

■ Respondent argues, also, that the amount of the fee had no effect on his client because the client would have recovered nothing even if the fee had been smaller. Respondent contends that reduction of the fee would only have resulted in a greater recovery by the Fund, which was not his client and to which, the argument continues, he had no duty. Assuming, *arguendo*, that all this is true (see *post*, p. 1244), we believe that respondent misapprehends his obligation. The issue is not one of tort duty to the Fund, but a question of the duty which respondent owes to the system of justice. Even if respondent owed no legal duty to the Fund, he owed his client, the profession and the judicial system an ethical obligation of charging no more than was reasonable. The profession's ethical requirements do not permit an attorney to extract unreasonable fees simply because those who must bear the ultimate loss are not in a lawyer/client relationship with the attorney. The axiom that a lawyer's duty is owed to his client does not support the corollary that all others are fair game.

We hold, therefore, the respondent did collect a clearly excessive fee in violation of DR 2–106(A). The Committee's findings and conclusions on this issue are approved and adopted.

## THE FAILURE TO ATTEMPT A COMPROMISE

The charges pertaining to DR 1–102(A)(5) ("conduct that is prejudicial to the administration of justice") revolve around the possibility that the Fund might have agreed to compromise its lien in order to allow Sarge to retain at least some portion of the tort recovery if respondent had offered a significant reduction in his contingent fee. In essence, the Committee concluded that respondent was aware of this possibility but was unwilling to reduce his fee and therefore made no attempt to negotiate with the Fund. In other words, the finding was that respondent manipulated the system by deliberately ignoring an opportunity to benefit his client in order to keep the entire fee. These conclusions are based upon the following evidence.

Although not required by statute, the Fund often will agree to reduce its lien. The situations where this is likely to occur vary. Where there are questions as to either liability or the amount of recovery, the Fund may reduce its lien, thus enabling the claimant to personally receive some monetary benefit, in order to encourage him to settle rather than go to trial. By such an arrangement, the Fund waives part of its lien but protects itself from loss of the entire lien if the verdict is adverse. However, in Sarge's case there was no question of either liability or amount of recovery. The evidence also showed that in some cases where ordinarily the claimant would receive nothing from his third party claim, the Fund would agree to reduce its claim if there was a corresponding reduction in attorney's fees. This reduction by the Fund could be in the form of a lien credit, whereby the claimant receives a lump sum payment which offsets future benefits or in the form of a waiver of part of both the lien and the future offset, so that the claimant receives some direct mon-

etary benefit which is not to be deducted from his future benefits.

Terence Fox, then an attorney for the Fund, testified that at his original meeting with respondent he suggested that at some time prior to a tender of policy limits by the liability insurer,

> it would be appropriate at that time to then approach the State Compensation Fund for a possible negotiation either by way of reduction of lien or reduction of [future] credit.

Fox testified that despite this suggestion, respondent failed to make any attempt to negotiate a lien reduction with the Fund. Consequently, Fox never presented any formal proposal for lien reduction to his supervisor, Robert Park. Fox testified that if he had received a compromise offer from respondent he would have sent it to Park with a favorable recommendation.

Respondent also contacted Charles Wilmer, a specialist in Workmen's Compensation, for advice concerning Sarge's case. Wilmer testified

> I think I suggested to him, that on a couple of occasions I have reduced attorney's fee of my recovery in a third party case, particularly with the State Compensation Fund, where the—the result of the settlement was not going to mean that much to the plaintiff, and I wanted my client to be happy—to feel there was a concrete result. And, I—it had been my experience that on some occasions, and perhaps all that I had been involved with, I really don't remember, the Fund would correspondingly reduce their lien if you would reduce attorney's fees. And, I said I didn't know whether they would do it in your case—I have no idea. But, I think that's your only possible route in terms of attempting to convince the Fund to reduce that roughly $100,000 lien.

Respondent claims he did attempt to negotiate, but his offer was rejected. However, the evidence that respondent did not negotiate for such a compromise is strong. Fox testified that respondent made no offer, and indeed, that on his own Fox informally inquired of Park whether the Fund might be allowed to initiate a proposal, but that Park vetoed the suggestion. Although respondent maintains that when he made an offer Fox refused to allow any compromise, there is no evidence to corroborate that testimony. Neither respondent's own files nor those of the Fund, reflected either offer or negotiations. Although the absence of such references in the files is not determinative, it strongly corroborates the evidence from Fox that respondent did not negotiate with the Fund.

Respondent argues that even if there is clear and convincing evidence to support the finding of fact that he made no effort to obtain a reduction in the Fund's lien by compromising his attorney's fees "or otherwise," this would not support the rest of the finding that "accordingly, Sarge personally received nothing" from the settlement of his personal injury claim. Respondent argues that even if he had compromised his fee, the only one to benefit would have been the Fund, and not his client. We find this unpersuasive. The evidence shows conclusively that the Fund has reduced its lien in other cases. Even in some cases where there was no particular advantage to the Fund, it has agreed that a reduction in fees would induce a partial, equivalent waiver of the lien, either with or without an offset as a credit to future benefits. Whether the Fund would have made any waiver in the case at bench is a matter of conjecture because respondent did not offer to reduce his fees and did not commence negotiations. Therefore, the Committee's finding that "accordingly" Sarge received nothing personally from the $150,000 settlement is supported by the evidence. Respondent was retained for the purpose of handling the workmen's compensation and third-party claims, and had a duty to give Sarge the benefit of the chance that such a waiver could be obtained. By not fulfilling his obligations, respondent ensured that no waiver was obtained. The Committee could infer causation from these facts. *See Restatement, Torts* (Second) § 323; *Thompson v. Sun*

*City Hospital, Inc.,* 141 Ariz. 597, 688 P.2d 605 [1984]. We think the finding is appropriate.

Thus, we find that there is clear and convincing evidence to support the findings of the Committee. Based on the Committee's findings of fact, we uphold the Committee's conclusion that by his conduct respondent

> consciously and willfully took advantage of the system of allowing attorneys' fees for third-party claims in workmen's compensation cases so as to maximize his own fees without attempting to obtain any direct monetary benefit to his client.

Respondent does not challenge the Committee's ultimate legal conclusion that such conduct would violate DR 1–102(A)(5) which states that a "lawyer may not engage in conduct that is prejudicial to the administration of justice."

### THE POLYGRAPH RESULTS

Respondent argues that the Committee erred by not considering the results of his polygraph examination. Disciplinary proceedings are governed by the rules of evidence applicable in the superior courts "as far as is practicable." Rule 35(b), Rules of the Supreme Court, 17A A.R.S.

We have previously held that the results of polygraph examinations will not be admissible as evidence in this state absent stipulation. *State v. Valdez,* 91 Ariz. 274, 371 P.2d 894 (1962). We have permitted use of polygraph evidence where the parties have stipulated to its admission in civil actions. *Hyder v. Superior Court,* 127 Ariz. 36, 617 P.2d 1152 (1980). No such stipulation was made here. Respondent argues that the evidence should have been considered by the Committee without stipulation and asks us to note the concurring opinions of Judges Howard and Hathaway of the Court of Appeals in *State v. Molina,* 117 Ariz. 454, 456, 573 P.2d 528, 530, (App.1977). We need not reach that issue today. Even where the parties have stipulated, the admission of polygraph results is subject to the discretion of the trial judge. *State v. Molina, supra.* In fact,

where such evidence has been admitted pursuant to stipulation, the trial judge must instruct the jury that the examiner's testimony does not prove or disprove any element of the charge, but at most tends to indicate that at the time of the examination, the person examined was or was not telling the truth. *State v. Trotter,* 110 Ariz. 61, 514 P.2d 1249 (1973). In addition, the court is to instruct the jury that they must determine the corrobative weight and effect which should be given to such testimony. *Id.*

Thus, even on stipulation for admission, in a disciplinary hearing the Committee would have had the discretion to admit or reject the polygraph evidence and, admitting it, to have given it some or no weight. In this case, the Committee admitted the evidence and gave it no consideration or weight. We note that the two relevant questions at issue in the polygraph exam were phrased as follows:

1. Did you fail to ask Terence Fox about Steven Sarge receiving money from that $150,000 settlement?

2. Did you at any time fail to ask Terence Fox about getting money from that $150,000 settlement specifically for Steven Sarge?

Respondent's answer to both questions was "no."

Both questions, however, were phrased in the negative, and, with a negative response, were ambiguous. On that basis alone, the Committee could have decided to disregard the polygraph results. From our independent review, we are not disposed to give significant weight to results based on questions phrased as were these.

### USE OF THE RESULTS OF THE MALPRACTICE ACTION

Respondent argues that the Committee should have considered the summary judgment entered in the malpractice action to the extent that the issues in that action parallel issues before the Committee. He asserts that issues concluded by the court's summary judgment had a direct

bearing on the issues in this disciplinary proceeding. For support, respondent cites *In the Matter of Kleindienst,* 132 Ariz. 95, 644 P.2d 249 (1982), quoting the following passage:

> The best support Kleindienst can muster for his defense is that the jury that considered the criminal charges arising from the same alleged perjury acquitted him. *Although serious consideration should be given to a jury's verdict of acquittal for the same conduct that is the subject of bar disciplinary proceedings, see Siegal v. Committee of Bar Examiners,* 10 Cal.3d 156, 110 Cal.Rptr. 15, 514 P.2d 967 (1973), ...

*Id.* 132 Ariz. at 101, 644 P.2d at 255 (emphasis added).

The language that continues at the end of the quote follows:

> *the acquittal is not conclusive of any fact in the bar proceedings,* especially where there is substantial evidence contrary to the verdict.

*Id.,* (emphasis added).

Sarge's malpractice action raised three issues. First, Sarge alleged that respondent negligently failed to discover an error in the Industrial Commission's calculation of average monthly wage and, therefore, failed to appeal that determination. Second, Sarge's complaint charged that respondent negligently relied on the advice of attorneys and adjusters from the State Compensation Fund in settling the third-party claim, and as a result paid all of the proceeds of the tort action to the Fund in settlement of their statutory lien, leaving Sarge with no money. Third, Sarge asserted that respondent was negligent because he failed to research the relevant area of the law and failed to consult disinterested counsel.

We do not believe the summary judgment entered against Sarge has particular evidentiary value in these proceedings. The issue regarding determination of average monthly wage was not relevant to the findings or conclusions of the Committee. The other allegations made in Sarge's malpractice action are also different from the issues decided in the findings and conclusions of the Committee. It is quite possible that respondent could be exonerated of the allegations made in Sarge's malpractice action and still be found to have committed the acts charged in this proceeding. We therefore hold that the record and outcome of the malpractice action against respondent was not relevant to any issue determined in the bar proceedings. The Committee's refusal to accord any weight to the results of that action was proper.

## SANCTIONS

The Local Administrative Committee recommended a six month suspension, while the Board recommended suspension for only thirty days. Three members of the Board dissented—two because they thought the discipline too mild, and one because he thought it too severe. The purpose of professional discipline is to protect the public rather than to punish the attorney. *In the Matter of Burns, supra.* A further purpose is the deterrence of like conduct by others. *In the Matter of Mercer, supra.* We note, further, that in evaluating proper discipline to be imposed, we may consider any prior disciplinary proceedings. Rule 38(a)(4). Respondent has previously been censured by this court. *See In the Matter of Swartz,* 129 Ariz. 288, 630 P.2d 1020 (1981). On analysis, that case bears one striking similiarity with the present proceedings. In the former case respondent concealed from or failed to disclose information to those with whom he was in a fiduciary relationship; there, as here, the impropriety was one calculated to give respondent a personal gain or advantage to which he was not entitled. In the former proceeding the personal advantage was the accumulation of money which was held by respondent, without the knowledge of his co-investors, for the prupose of protecting respondent in the event that he was forced to make good on his guarantee to his co-investors. In the matter at bench, respondent failed to perform his obligations to his client for the purpose of pro-

tecting his fee. We find the pattern of similarity disturbing.

 While charging an excessive fee may warrant no more than a brief suspension, we believe that manipulation of the system to the client's disadvantage and for the lawyer's personal advantage strikes to the very heart of a lawyer's obligation to his client. Thus, while we customarily defer to the recommendations of the Board and Committee (*See In the Matter of Burns,* 139 Ariz. at 492, 679 P.2d at 515; *In the Matter of Kleindienst,* 132 Ariz. at 102, 644 P.2d at 256), we cannot do so with regard to the violation of DR 1–102(A)(5). We hold, therefore, that respondent shall be suspended from the practice of law for a period of six months, commencing thirty days from the date on which this opinion is filed. It is further ordered that costs of $3,405.50 be assessed against respondent, pursuant to Rule 37(g), Rules of the Supreme Court.

One further matter must be considered. Respondent has collected a fee which is clearly excessive. It is not proper that respondent retain these funds. We have inherent power to regulate the practice of law. *See Matter of Anonymous Member of the State Bar of Arizona,* 128 Ariz. 238, 239, 624 P.2d 1286, 1287 (1981); *State Bar of Arizona v. Arizona Land Title and Trust Co.,* 90 Ariz. 76, 88, 366 P.2d 1, 9 (1961); *In the Matter of Greer,* 52 Ariz. 385, 81 P.2d 96 (1938). Accordingly, it is ordered that respondent refund to Sarge and the State Compensation Fund the excessive portion of the fee collected. If the parties cannot agree on the amount of a reasonable fee, that sum may be determined by submittal of the matter to the appropriate bar committee. Respondent will not be allowed to apply for reinstatement until the refund has been made. *See Florida Bar v. Moriber,* 314 S.2d 145, 149 (Fla.1975).

HOLOHAN, C.J., GORDON, V.C.J., and HAYS and CAMERON, JJ., concur.