726 P.2d 587

**In the Matter of a Member of the State Bar of Arizona, Robert E. KERSTING, Respondent.**

**No. SB–331.**

Supreme Court of Arizona, En Banc.

Sept. 23, 1986.

172

Marc Kalish, Phoenix, for State Bar.

Mahoney, Lehman & Rood by William P. Mahoney, Jr., Phoenix, for respondent.

FELDMAN, Justice.

Local Administrative Committee 5G of the State Bar found that Robert E. Kersting (respondent) violated the Code of Professional Responsibility by engaging in certain fraudulent transactions. Rule 29(a), Ariz.R.S.Ct., 17A A.R.S.[1] The local committee recommended a minimum six-month suspension, with one member recommend-

ing disbarment. Respondent objected and sought review of the local committee's findings before the Disciplinary Commission. The Commission adopted and approved the local committee's findings of fact and conclusions of law and recommended a nine-month suspension, with two members voting for a longer suspension. We decide this case pursuant to former Rule 37, Ariz. R.S.Ct., 17A A.R.S. (1984).[2]

## INTRODUCTION

In disciplinary proceedings against members of the State Bar, we are an independent trier of fact and law and will impose discipline only if we find clear and convincing evidence of misconduct. *Matter of Swartz*, 141 Ariz. 266, 271, 686 P.2d 1236, 1241 (1984). We do, however, grant great weight to the local committee's findings of fact and conclusions, particularly when the credibility of witnesses is necessary to determine ultimate facts. *Id.* Conflicts in the testimony do not prevent us from independently finding clear and convincing evidence, *i.e.*, that the truth of the contentions is "highly probable." *Matter of Neville*, 147 Ariz. 106, 110–11, 708 P.2d 1297, 1301–02 (1985).

Respondent claims to possess expertise in securities and real estate law. The local committee considered respondent's expertise significant because the alleged frauds involved both securities and land. While we do not hold respondent to a higher standard simply because of his expertise, we may legitimately view his claims of ignorance or inadvertence more skeptically. The local committee found by clear and convincing evidence that respondent engaged in conduct involving "dishonesty, fraud, deceit, or misrepresentation," DR 1–102(A)(4), and "conduct that adversely reflects on his fitness to practice law," DR

1. Because the events in question all occurred prior to February 1, 1985, these proceedings are governed by the Code of Professional Responsibility, Rule 29(a), and not the Rules of Professional Conduct, Rule 42, Ariz.R.S.Ct., 17A A.R.S. Order Deleting Rules 27 Through 49, Rules Of The Supreme Court, And Substituting Amended

Rules 27 Through 121, Rules Of The Supreme Court, In Their Place, *reprinted in* 1984 Special Pamphlet (West 1984).

2. The order cited in note 1, *supra*, requires application of the procedural rules in effect at the time of the hearing before the committee.

1–102(A)(6). The committee also found that while representing a client, respondent concealed or knowingly failed to disclose that which he was required by law to reveal, knowingly made false statements of law or fact, and counseled or assisted his client in conduct that he knew to be illegal or fraudulent. DR 7–102(A)(3), (5), and (7).

## FACTS

Sunshine Land & Cattle Corporation (Sunshine) was formed in 1970 to develop and sell subdivided lots located approximately forty miles west of Phoenix in an area designated as Phoenix Valley West. Subsequently, Sunshine added a second subdivision, Phoenix Valley West II, and planned other developments.

Respondent was an incorporator, substantial stockholder, director, and officer of Sunshine from its inception through March 1, 1974. During that period, he also served as general counsel and was involved in the "ownership, management, and day-to-day operations" of the company. Finding IV(1). He was described in publicly disseminated corporate literature as a driving and sustaining force behind Sunshine. He received "significant and substantial income" from the company. *Id.* The record supports the committee's finding that respondent's "activities included looking after all legal aspects including minutes, zoning matters, borrowings, structure of borrowings and all paperwork involved in the operation of the corporation and the financing for individual investors." Finding IV(4).

Sunshine's operation generally consisted of purchasing desert land, rezoning, subdividing, and improving it, and then marketing the lots in a number of states. Virtually all lot sales were made on an installment basis with down payments of ten to twenty percent. Typically, a lot purchaser would sign a purchase money note evidencing the deferred balance owed Sunshine. The purchase money notes amortized over a number of years and were secured by purchase money mortgages encumbering the lot sold.[3] Sunshine was the payee of the purchase money notes and the mortgagee named in the purchase money mortgages. To raise and maintain operating capital, Sunshine usually discounted the purchase money notes that it received from the lot purchasers and endorsed or assigned them to investors. It also assigned the purchase money mortgage to the same investors (mortgage investors). Consequently, the mortgage investor, as Sunshine's assignee, held title to both the purchase money note and mortgage.[4]

The language of the assigning instrument between Sunshine and the mortgage investor is noteworthy. Sunshine assigned and transferred the purchase money mortgage, "[t]ogether with the obligation therein described, and the money due and to become due thereon," and appointed the mortgage investor as its assignee to collect the money due. The assignment instrument also provided that it was "further agreed" by Sunshine and the mortgage investor as follows:

> Should [the lot purchaser] become delinquent on his payments ..., or should said [purchase money] mortgage be paid, prior to maturity, [Sunshine] shall accept a reassignment of said delinquent or prepaid mortgage and redeliver to the [mortgage investor] a substitute mortgage and promissory note having a principal unpaid balance in the same amount, or adjusted to the same amount, as that remaining on the [purchase money] mortgage in default, with the same recourse provisions.

Of course, the quoted provision made the security provided by the purchase money mortgage largely illusory. The mortgage investor/assignee of the purchase money

---

**3.** Some sales were secured by deeds of trust. The distinction is irrelevant to the case. Therefore, for convenience, we will refer to all of the devices securing the purchase money notes as purchase money mortgages.

**4.** The distinction between endorsement and assignment is also irrelevant to the case. All transfers of the notes will be referred to as assignments.

mortgage was unable to foreclose on the supposed security in the event of default and was obligated to accept a substitute mortgage on some other, unidentified property. More importantly, in the event of prepayment the investor/assignee received a substitute mortgage on other property instead of the proceeds from the original property. Theoretically, the investor/assignee would continue to receive amortized payments on the original terms.

The assignment forms were accompanied by an equally unusual "Installment Collection Agreement" between the mortgage investor and Minnesota Title Company as "Collection Agent" for the purchase money note and mortgage. The agreement gave the collection agent authority to collect the payments to be made by the lot purchaser on the purchase money note and mortgage. The collection agreement then bound the investor/assignee "to deliver to *collection agent* the promissory note upon payment of said note in full or replacement with a substitute note...." (emphasis supplied). Finally, as party to the so-called collection agreement, Sunshine authorized the collection agent to pay the mortgage investor monthly payments from Sunshine's own funds of a specified amount over a specified number of months. These payments were "to be in lieu of those which would otherwise be collected [from the purchase money note and mortgage] and forwarded to [the mortgage investor/assignee]." The unusual terms of the collection agreement, when combined with the "Assignment of Mortgage," meant that any time a lot purchaser prepaid the purchase money note and mortgage, the prepaid funds went to Sunshine. The assignee holding the purchase money note and mortgage would, if he or she were lucky, continue to receive the monthly amortization payments from a substitute note and mortgage. Under this system, a mortgage investor might have to wait years for monthly amortization of an uncollected balance when the security that he or she had purchased had already been discharged by the lot purchaser's prepayment and replaced with substitute security. It is also possible, as was true in some

transactions, that the substitute note and mortgage was "in the same amount" as the original note and mortgage, but did not provide the same security.

Sunshine obtained necessary approval from the appropriate government agencies to sell lots in the subdivision. However, the securities (the purchase money promissory note and mortgage and assignment of mortgage) sold to the mortgage investors were not registered with the Securities and Exchange Commission (SEC). In 1971, when the SEC learned of Sunshine's activities, it instituted legal proceedings to enjoin Sunshine from marketing the notes and mortgages without first properly registering them; ideally, registration would ensure that all material facts were accurately and fully disclosed to potential investors. In a July 7, 1972 consent decree, Sunshine agreed to cease all interstate sales.

The record supports the committee's finding that respondent had "extensive participation in all matters relating to defense and eventual resolution of the litigation" surrounding the consent decree. Finding IV(4). The committee also found that respondent knowingly violated the consent decree. Finding IV(7). We do not believe the evidence of a knowing violation is clear and convincing, although respondent, who certainly understands the principles of full disclosure, knowingly allowed transactions begun before entry of the consent decree to be consummated after the decree without telling the mortgage investors about the injunction prohibiting the sale of such securities. He claims that the SEC permitted Sunshine to close transactions in progress. Whether his claim is correct is unclear from the decree's language and the conduct of the SEC officials in charge. However, even if the decree was only to apply prospectively, its existence was a material fact that, as respondent admits, should have been disclosed prior to closing.

Later in 1972, Sunshine needed more capital and sought to borrow money from The First National Bank of Arizona. The bank agreed to loan money to Sunshine only if given adequate security. The bank was

willing to accept as security only those purchase money notes and mortgages with a good payment history—so-called seasoned notes. At the time, almost all the seasoned notes had been sold to previous mortgage investors; Sunshine itself held few, if any, seasoned purchase money notes. Thus, Sunshine began a program of recalling the seasoned purchase money notes held by mortgage investors and exchanging them for new, or "green," purchase money notes and mortgages from recent lot sales. These green notes were mostly subject to 180–day "cancellation" rights and had little or no payment history. The "green paper," therefore, was probably a less secure investment than "seasoned paper." No doubt this was the bank's reason for refusing to take green notes as security for its loans to Sunshine.

Without disclosing any of the reasons for the exchange, Sunshine solicited mortgage investors who held the seasoned notes to allow substitution of collateral. During that same period, a number of recent lot purchasers either rescinded their purchases, thereby cancelling their green notes, defaulted, or paid the notes in full before the due date. Sunshine did not inform the mortgage investors when notes were cancelled, defaulted, or paid. Instead, it continued to make the monthly payments using its own funds. These transactions effectively substituted Sunshine's unsecured obligation for the security which the mortgage investors expected to have.

Sunshine's sole source of income was from lot sales; continued lot sales generated the income Sunshine needed to pay its obligations to the investors who had bought purchase money notes or loaned money on Sunshine's own promissory notes. Sunshine also paid large commissions to sales agents, thus reducing its return. Further, because of the assignment program, Sunshine often ceased to have any interest in or cash flow from the property but continued to have an obligation to install general improvements such as roads and water lines.

In 1972 it became apparent that sufficient income could not be generated from the few unsold lots remaining in Phoenix Valley West I and II. Therefore, Sunshine applied for approval to subdivide and sell additional property as phases III and IV of the Phoenix Valley West subdivision. In May 1973, the Maricopa County Planning Commission recommended rejection of Sunshine's rezoning request, a condition precedent to the planned subdivision. In September 1973, the Maricopa County Board of Supervisors rejected the request to rezone. Consequently, Sunshine had no more lots to sell and no other source of income. The company was therefore unable to continue to pay investors or satisfy its other obligations, including developing the site.

Sunshine then began substituting its own promissory notes, secured by unsubdivided desert land which it owned near the Phoenix Valley West subdivisions, for purchase money notes assigned to mortgage investors. It could then resell the recovered purchase money notes or hypothecate them to the bank for new loans. The mortgage investor would be left with a new note evidencing the direct obligation of Sunshine and secured by undeveloped desert land not zoned for development, rather than the purchase money note and mortgage made by the original lot purchaser. The desert land remains undeveloped. The investors were not told the true reasons prompting Sunshine to substitute its notes for the purchase money notes held by the mortgage investors, nor were they told of Sunshine's serious financial difficulties.

Shortly after these substitutions, Sunshine notified the investors that it could not meet its obligations and that it had no assets other than the raw desert land securing the notes. The investors were offered deeds in lieu of foreclosure as an alternative to filing lawsuits and obtaining judgments against the insolvent corporation. Most investors reluctantly accepted the offered deeds. This program began in late 1973 and was ongoing in January and February 1974. Throughout this period, respondent was involved in the day-to-day conduct of Sunshine's operations.

## DID RESPONDENT ENGAGE IN CONDUCT INVOLVING FRAUD OR DECEIT; DID RESPONDENT, BY CONCEALMENT OR FALSEHOOD, ASSIST A CLIENT IN PERPETRATING A FRAUD?

■ Because we find it determinative, we turn first to the substitutions by Sunshine of promissory notes secured by mortgages on raw desert land for seasoned mortgage notes secured by liens on subdivided lots. For the most part, the lot purchasers were unsophisticated, out-of-state investors who bought the land sight-unseen at free dinners organized by teams of Sunshine's sales personnel. The purchase money mortgages were then sold to other unsophisticated investors by similar methods. Neither category of investors was composed of people with experience in real estate business, real estate subdivisions, or real estate financing. The typical purchasers were working people—all eager to buy land in Arizona and retire here or share in our economic prosperity.

The letter Sunshine sent to mortgage investors to solicit the substitutions [5] stated that Sunshine had decided it was "feasible" to exchange the paper, implied that doing so was in the investor's interest, stated that the new collateral "provide[d] equal or greater security," and offered a small fee as compensation for the investor's inconvenience. The letter did not inform the investors of any of the following:

1. "feasibility" was not specified in the agreements as one of the criteria for substitution;

2. Sunshine was suffering severe cash flow problems;

3. unsubdivided desert land is less marketable than the original lots; and

4. the new obligation was owed by Sunshine itself, and not by an investor making payments on a subdivided lot.

As to one of these investors, the committee found that there was a failure to "disclose material facts which would have assisted [the investor] in making a fully informed decision" and that "the effect of this … letter and subsequent substitution of collateral was to provide [the investor] with a less marketable security interest."

■ One of the issues in the proceeding below was whether these transactions violated the specific terms of the original instruments. We do not believe this issue is determinative. A lawyer may violate his ethical obligations even though he does not breach a contract that he understood but which those with whom he was dealing did not or could not understand. *See, e.g., Matter of Neville*, 147 Ariz. at 113, 708 P.2d at 1304. We believe that the failure to disclose to these unsophisticated investors the real reasons for the proposed exchange of security, especially given their willingness to cooperate and their reliance on Sunshine, transcends any technical argument about interpretation of the agreement. Sunshine was reacquiring the purchase money notes and hypothecating them to the bank because the bank would not accept the collateral Sunshine foisted on its own mortgage investors as a "substitution." We believe that respondent violated DR 1–102(A)(4) [6] and DR 7–102(A)(3), (5), and (7) [7] when he helped Sunshine to effect the substitutions by failing to disclose some material facts and actively misrepresenting others, *e.g.*, that the desert land was better security than the lot mortgages.

---

5. See Appendix A for the full text of the letter.

6. DR 1–102 provides in pertinent part:
   (A) A lawyer shall not:

      .    .    .    .    .

   (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

7. DR 7–102 provides in pertinent part:
   (A) In his representation of a client, a lawyer shall not:

.    .    .    .    .

(3) Conceal or knowingly fail to disclose that which he is required by law to reveal

.    .    .    .    .

(5) Knowingly make a false statement of law or fact.

.    .    .    .    .

(7) Counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent.

Respondent raises several points that he claims prevent a finding of any ethical violation. The committee found that the mortgages on raw land substituted for the purchase money mortgages were less marketable than the lots that they held as security and on which payments were being made. Respondent claims that this finding is unsupported. A great deal of testimony was offered about whether the raw, unsubdivided land was less valuable than the lots. Regardless of the answer, the investors had a right to the facts so they could decide for themselves. Further, respondent's argument is belied by Sunshine's efforts to rezone the desert land so it could be sold. Respondent's protestations that raw desert land was as valuable as the subdivided land did not persuade the committee and do not persuade us.

Next, respondent disputes whether the investors were his clients and, therefore, whether he owed them a duty arising from the attorney-client relationship. We agree that respondent was not the investors' attorney. *See Egan v. McNamara*, 467 A.2d 733, 738 (D.C.App.1983) (client is corporation, not shareholders, officers or directors, let alone those doing business with the corporation). Rather, respondent was an officer, director, and legal counsel to Sunshine. We have previously recognized that in the context of DR 5–104(A), "lawyers are provided no bright line by which to determine when they can act as ordinary business people in relation to the interests of those whom they have represented in the past or whom they represent on other matters at the present." *Matter of Neville*, 147 Ariz. at 112, 708 P.2d at 1303. Analogous reasoning applies to this case.

A lawyer does not cease to be bound by the ethical code merely because he is an officer or director of a company. Although a lawyer is not guilty of an ethical violation every time a business loses money or fails, a lawyer *is* bound not to engage in "conduct involving dishonesty, fraud, deceit, or misrepresentation," whether he has one hundred clients or none and whether he acts as a principal or as an agent. DR 1–102(A)(4).

Other decisions support this result. For instance, where an attorney was engaged in business with nonlawyers, the Pennsylvania court stated that DR 1–102(A)(4) applies whether or not the acts occurred in the course of an attorney-client relationship. There is no distinction " 'between dishonesty involving client matters and dishonesty in private matters.' " *Office of Disciplinary Counsel v. Ewing*, 496 Pa. 35, 45, 436 A.2d 139, 144 (1981) (quoting *Office of Disciplinary Counsel v. Grigsby*, 493 Pa. 194, 200, 425 A.2d 730, 733 (1981)). "[T]he obligations and responsibilities of an attorney transcend the attorney-client relationship and encompass all professional conduct by the attorney. ... [E]ven in his non-professional conduct an attorney must be honest and truthful." *Levi v. Mississippi State Bar*, 436 So.2d 781, 785 (Miss. 1983). Similarly, an attorney incorporator who was general counsel and a shareholder of a corporation and who deceived other shareholders as to the status of an insurance refund, was found in violation of DR 1–104(A)(4) and "the high standards of honesty, justice, and morality" expected of an attorney. *People v. Vernon*, 660 P.2d 879, 880 (Colo.1982). Finally, an attorney running for public office is bound by the ethical rules and cannot make false statements in speeches. "A lawyer is bound by the Code ... in every capacity in which the lawyer acts, whether acting as a lawyer or not." *State v. Russell*, 227 Kan. 897, 902, 610 P.2d 1122, 1127 (1980); *see also People v. Pittam*, 194 Colo. 104, 572 P.2d 135 (1977) (attorney bound by the Code in his business activities with law partners).

These cases show that the rules requiring lawyers to act ethically do not apply only in the attorney-client context. Respondent acted in both his personal and professional capacities.

"In a proceeding such as this, ... the underlying question is 'whether, after the conduct of this man, it is proper that he should continue [as] a member of [the legal] profession' ... the answer to this question must be no when ... the offense entails the employment of dishonesty, fraud, or deceit which is perpetrat-

ed to enrich the offending attorney or to enhance his own well-being at the expense of his client, the state, or *any other individual.*"

*Matter of Wines*, 135 Ariz. 203, 208, 660 P.2d 454, 459 (1983) (quoting *Maryland State Bar Association, Inc. v. Agnew*, 271 Md. 543, 549–50, 318 A.2d 811, 814–15 (1974)) (emphasis supplied; brackets by the court; citations omitted); *see also Matter of Lowther*, 611 S.W.2d 1, 2 (Mo.1981) ("The [disciplinary] matter before the Court illustrates the inherent danger of ... 'taking a piece of the action.' The attorney ... can pursue this course only at his peril. It is an area [fraught] with pitfalls and traps and ... the attorney is held to the highest standards.").

■ We hold that an attorney need not have an attorney-client relationship with investors to apply DR 1–102. Of course, DR 7–102 does not require an attorney-client relationship with the investors. Instead, it is sufficient if the lawyer is representing any client. Under the facts before us we hold that respondent was "representing" Sunshine. Respondent was acting as Sunshine's general counsel and personally participated in the transactions at issue. Although corporate counsel may not be subject to discipline for every fraudulent act committed by their employers, respondent does not claim that the transactions at issue here were pursued or conducted without his knowledge and input.

## OTHER FACTORS SUPPORTING THE COMMITTEE'S FINDINGS

Respondent was not an innocent adviser manipulated by his clients. He was a securities and real estate lawyer and an officer, director, and general counsel of Sunshine. He spent most of his time engaged in the company's affairs. Respondent participated in, organized, and orchestrated the events in question, drafted many of the documents, and stood to make a great deal of money if the development succeeded. Respondent was familiar with the financial structure of the company and knew of the negative cash flow. He was aware that once the mortgages were sold to investors Sunshine could never make another dollar from its lots, yet had a continuing obligation to improve the property. He must have known that with the ever-greater need for more land to sell to satisfy earlier obligations there was a significant risk that the project would fail and that investors would be hurt. Yet respondent did nothing to alert the mortgage investors to the risks involved in the substitution program and helped build a facade to hide Sunshine's dire situation. Partial disclosure did not alter the primary fact that the essence of the transaction and its risks were not disclosed. Candor was not a hallmark of the operation.

The committee also found that respondent "reviewed all significant portions of certain news publications prepared and distributed by Sunshine. ... One such 'progress report' although dated January 1974, was actually prepared in September or October of 1973." The report failed to mention "significant and material adverse business factors directly affecting Sunshine's business" which were known to respondent at the time. Respondent admits that the progress report was misleading because it failed to disclose the SEC consent decree and injunction, Sunshine's financial problems, and the failure to obtain zoning approval critical to Sunshine's continued existence. He also admits that he was ultimately responsible for its preparation.

Respondent also misrepresented facts to the Wisconsin Real Estate Board when he wrote on March 7, 1972 that "all roads throughout the subdivision units offered for sale have been completed well ahead of schedule and additional hard surfacing has been completed on over nine miles of subdivision roads. Complete hard surfacing of all roads is in process." In fact, on August 10, 1973, the Arizona Real Estate Commission suspended approval of sales of lots in Phoenix Valley West II because, contrary to the development plan, the

> roads have been bladed only. No ditches or drain areas have been developed; no culverts are installed; roads are below lot level and will catch all water in case of rain. Silt up to six inches covers portions of these roads.

Kersting wrote his letter "in the capacity of Secretary-Treasurer and General Counsel for Sunshine Land and Cattle Corporation."

## CONCLUSION

██ We conclude that respondent violated DR 1–102(A)(4) and DR 7–102(A)(3), (5), and (7). The bar commission recommended a nine-month suspension. We recognize that the purpose of bar discipline is not to punish the lawyer but to deter others and protect the public. *Matter of Swartz, supra.* We also note that respondent, in his many years of practice, has never been disciplined.

Nevertheless, the record indicates, with clear and convincing weight, that in his business activities with others respondent failed to display the degree of candor and forthright disclosure that we believe the rules of discipline in effect at the time of the charges and those now in effect require of lawyers. Given the absence of previous improprieties and lack of specific wrongful intent to defraud, we believe the nine-month suspension recommended by the bar committee is appropriate and we therefore approve that suspension. Rule 37, Ariz.R. S.Ct., 17A A.R.S.

Respondent is suspended from the practice of law for nine months from the date of this opinion and is ordered to pay $5,309.97 in bar costs. Rule 37(g), Ariz.R. S.Ct., 17A A.R.S.

HOLOHAN, C.J., GORDON, V.C.J., and CAMERON, J., concur.

HAYS, J., did not participate in the determination of this matter.

## APPENDIX A

Sunshine Land & Cattle Corporation

2946 North 7th Ave. • Phoenix, Arizona 85013 • (602) 248–9100

September 19, 1972

Dear

In connection with your present holding of the LaPlant mortgage assigned to you by our company, we have found it feasible to replace same with collateral providing equal or greater security. This change of collateral requires your signing and return of certain documents presently held by you or enclosed with this letter. In order to compensate you in part for this inconvenience, and to defray any costs of a notary public, we enclose our check to your order in the amount of $10.00. Upon our receipt of other signed documents as required, we will forward another check to your order in the amount of $10.00 with our thanks.

Please return the following *original* documents which you hold (not the photocopies of these documents which you also should have in your file):

1. the original Purchase Money Note
2. the original Assignment of Mortgage

Next, we enclose a stapled group of documents all of which require your signatures before a notary public and prompt return to us as follows:

1. Installment Collection Agreement
2. Satisfaction of Mortgage
3. Assignment of Mortgage

Finally, we enclose for your files an additional stapled group of document copies for your information and holding. As soon as you can return to us the signed and notarized group of documents, we will immediately begin the processing of these documents and forward on to you the recorded documents required to complete this transaction and your file. We should be able to complete the entire transaction within a period of no longer than 60 days from the time of the receipt of your returned documents.

If you have any questions whatsoever about this transaction, please feel free to call me collect. Rest assured that we appreciate your confidence in our company and that we are as concerned as you are in the protection of your investment based on the successful management of our company.

Very truly yours,