759 P.2d 594

**In the Matter of a Member of the State Bar of Arizona,**

**Luther Terry GRIMBLE, Respondent.**

**No. SB–87–0034–D.**

Supreme Court of Arizona, In Banc.

July 26, 1988.

Slutes, Sakrison, Grant & Pelander by Tom Slutes, Tucson, for Respondent.

Davis, Siegel & Gugino, P.C. by Barry M. Davis, Tucson, State Bar Counsel.

CAMERON, Justice

## I. JURISDICTION

This is a review of the recommendations of the Disciplinary Commission of the Arizona Supreme Court. We have jurisdiction pursuant to Ariz.R.S.Ct. 46 and 53(e), 17A A.R.S.

## II. QUESTIONS

We must answer two questions:

A. Was there an "attorney-client" relationship between Respondent, in his capacity as director of the Arizona Drug Control District, and Pima County, his employer?

B. Was there sufficient evidence to find that Respondent violated the Code of Professional Responsibility? [1]

## III. PROCEDURAL HISTORY

In 1981, the news media reported that Respondent, L. Terry Grimble, Director of the Arizona Drug Control District, had "phonied up" certain travel vouchers and receipts in seeking reimbursement of travel

---

1. The conduct in question occurred prior to the adoption of the Model Rules of Professional Conduct of the American Bar Association as amended, Rule 42, Arizona Rules of Profession- al Conduct, effective 1 February 1985. Thus, the Respondent was charged under the previous Code of Professional Responsibility, Ariz.R.S.Ct. 29(a), 17A A.R.S., effective 1 November 1970.

expenses and in justifying draws against travel expenses. Respondent resigned. On 21 October 1985, the state bar lodged a sixteen-count complaint against Respondent. The complaint alleged that Respondent "authorized, ratified and condoned the use and submission of false claims and false expense reports, improperly used government contracts for the purchase of items for personal use and improperly used state funds for rental of an apartment in Phoenix." Respondent was also charged with failure to maintain complete and accurate records.

After a lengthy hearing, during which approximately twenty witnesses testified, the Local Administrative Committee ("Committee") filed its Findings of Fact, Conclusions, and Recommendations. In essence, the Committee found that Respondent, while employed as the director of the Arizona Drug Control District ("District"), was often late in filing travel vouchers and related materials that would document expenditures he made in connection with District business. Specifically, Respondent failed to timely account for funds advanced to him by the District.

The Committee then recommended that Respondent be publicly censured. Respondent objected to the findings and the recommended sanction and sought review by the Disciplinary Commission (Commission). Ariz.R.S.Ct. 53(d), 17A A.R.S.

On 24 June 1987, after a formal hearing, the Commission filed its report stating:

> The Commission adopts the Local Administrative Committee's conclusions of law as set forth in its report, filed January 6, 1987 and concludes clear and convincing evidence has been presented to show violations of Sup.Ct.Rules, Rule 29(a), Code of Professional Responsibility, specifically DR 9–102(B)(3) and (4).

A majority of the Commission recommended the sanction of public censure. Two members of the Commission contended that a lesser sanction was appropriate under the circumstances. Respondent objected to the report and appealed to this court. Ariz.R.S.Ct. 53(e), 17A A.R.S.

## IV. FACTS

Respondent was appointed director of the Arizona Drug Control District by the Pima County Attorney in the mid–1970's, and stayed in that position until January 1981. The District was created in an effort to investigate and provide assistance in the prosecution of persons involved in narcotics trafficking. Some established law enforcement agencies did not receive the District with open arms, and although the District was able to gain the acceptance and cooperation of certain agencies, others perceived its creation as an attempt to encroach on their respective "territories." As director, Respondent was responsible for the District's efforts to forge successful working relationships with other law enforcement agencies. He was also responsible for obtaining and maintaining funding for the District, from both state and federal sources. In addition, Respondent assisted other narcotics-related enforcement agencies and associations nationwide, many of which were patterned after the District. As a consequence of his varied duties, Respondent spent a great deal of time in places other than Tucson. He frequently traveled to Phoenix in order to meet with legislators and other officials. His out-of-state travel schedule was extremely demanding, ultimately resulting in his illness.

From the testimony, it appears that Respondent had failed to submit the appropriate data to the Pima County Finance Department in connection with various travel-related expenditures. As a result in one case, finance personnel contacted Pima County Attorney Stephen D. Neely, who was Respondent's supervisor, and told him that the paperwork in question was long overdue and had to be submitted immediately. Neely, who had previously received similar complaints regarding Respondent, contacted the District's administrative personnel and told them to collect and submit the necessary items at once. Respondent was out of town when these events took place. District personnel, apparently misunderstanding Neely's instructions to "reconstruct" Respondent's itinerary, obtained and "phonied up" blank hotel and restau-

rant receipts in an effort to bring Respondent's paperwork up to date by the use of a dummy voucher.[2] The hotels and restaurants from which the blank receipts were obtained were those often visited by Respondent during his travels. These receipts were sent to the Finance Department and represented as valid, legitimate expenditures. However, the record reveals that Respondent knew that blank receipts were going to be used in the preparation of claims.

The Local Administrative Committee made the following findings of fact:

1. Beginning as far back as 1978 and extending through March, 1981 when Mr. Grimble left the Strike Force, he poorly accounted for and ignored his client's requests for proper accounting of travel advances which he took from Pima County. The County grants travel advances and then requires accountings filed by the traveler with the appropriate receipts attached which provide information on how the travel advance was spent. Then, the County reconciles the advance to the money spent to determine whether the traveler is entitled to a refund or the traveler should repay some of the funds advanced.

2. Mr. Grimble was notoriously late in filing his accounting reports. He took his travel advances from the county but failed on numerous occasions to provide the documentation to the county which was necessary for the reconciliation. Exhibit 3 before the Committee, a Memorandum to Stephen D. Neely, County Attorney, from Peter A. Larsen, Administrative Officer, dated July 2, 1979, points out that Mr. Grimble had repeatedly neglected to make the settlement required after travel had been performed. As of the time of that Memorandum, Mr. Grimble had repeatedly neglected to make the settlement required after travel had been performed. As of the time of that Memorandum, Mr. Grimble had seventeen ad-

vances outstanding, amounting to $2,420. Mr. Larsen's July 1979 Memorandum goes on to say that Mr. Grimble had travel as far back as 1978 which had not yet been documented and, therefore, Mr. Larsen was requesting an investigation regarding the travel advances.

3. Exhibit 1 provided to the Committee was a Memorandum to Stephen D. Neely as Arizona Drug Control District Administrator from Andrew Migala, the Finance Director of Pima County, regarding travel advances. Mr. Migala pointed out, as of the date of his Memorandum, May 30, 1980, that the Drug Control District had thirty-eight travel advances outstanding which needed reconciliation. Of those, nine belonged to Terry Grimble, one as far back as December 21, 1979.

4. Exhibit 2 presented to the Committee was a Finance Department memorandum to Stephen D. Neely from Lindell Jones of the Pima County Finance Department dated 8/6/80 attached to eleven separate memoranda regarding non-filed travel advances for the Drug Control District. Mr. Grimble's memorandum showed that nine advances were still due from him. Each of these memorandum points out that the requirement was that travel advances were to be settled within five days after completion of the trip for which the advance was made.

Respondent purchased a desk and credenza from Walsh Brothers through the Drug Control District. The desk was shipped to Mr. Grimble's apartment in Phoenix which he had leased as an official work location.[3] However, Mr. Grimble testified that it was always his intention to treat this desk as his personal property. He did not, however, pay for this desk initially. It was paid for by the Drug Control District, and it was only after he received letters from the accounting department of the Drug Control District that he submitted his personal check to pay for the desk. Respondent

---

2. Dummy voucher was defined as a receipt that was not made at or near the time that the expense was incurred for the place in which it was actually incurred.

3. In actuality, however, the apartment was not rented for official purposes, and the funds used for rentals were to be repaid by Respondent.

also purchased a matching credenza which was delivered to Mr. Grimble's apartment several months later because it was not initially available. Like the desk, it was billed to the Drug Control District.

The Committee found that "Mr. Grimble inappropriately took advantage of his official position to purchase property for his personal use with his client's funds, and although it was done without fraudulent or dishonest intent, it did result in inappropriate use of client funds as a source of personal credit for some period of time." The Committee did admit, however, that there was no dishonesty on the part of Mr. Grimble in these activities, and at no time did he steal money from the County or the Drug Control District. The Commission agreed.

## V.  ATTORNEY–CLIENT RELATIONSHIP

The Committee and the Commission found that Respondent violated the attorney-client relationship as proscribed by the Code of Professional Responsibility, and specifically by DR 9–102(B)(3) and (4) which read:

(B) A lawyer shall:

(3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them.

(4) Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive.

In Bar Discipline matters, it is the duty of the Supreme Court to make an independent determination of the facts from the record. In the *Matter of Lurie*, 113 Ariz. 95, 546 P.2d 1126 (1976). We do not believe that there was an attorney-client relationship. *See Matter of Neville*, 147 Ariz. 106, 111–112, 708 P.2d 1297, 1302–1303 (1985). The job did not require that Respondent be an attorney and his work did not require that he perform the duties and responsibilities of an attorney.

This canon, cited above, is concerned with the special obligation an attorney has to preserve the property of the client and to provide the client with prompt accounting. It does not apply to other obligations that an attorney also has to preserve and account for the property of others which comes into the attorney's possession. We find no violation of DR 9–102(B)(3) and (4).

## VI.  DID RESPONDENT VIOLATE THE CODE OF PROFESSIONAL RESPONSIBILITY?

That the attorney-client relationship did not exist, does not in this case, excuse Respondent from bar discipline.

Respondent first contends that he was not acting in the capacity of an attorney, but merely as a fellow-businessman along with the other two parties. We state at the outset that it makes no difference whether he was acting as an attorney or as a businessman. There is nothing to prevent an attorney from engaging in business or other activities, but when he does so he does not abandon his professional ethics if he wishes to remain a member of his profession. *Matter of Lurie*, 113 Ariz. 95, 97–98, 546 P.2d 1126, 1128–29 (1976); *See also, Matter of Zussman*, 86 Ariz. 272, 344 P.2d 1021 (1959). A rule in existence at the time of Respondent's conduct provided for jurisdiction over Respondent because he was a member of the bar. That rule stated that grounds for discipline were:

Any action or omission, either related or unrelated to the practice of law, indicating mental or moral unfitness to continue the practice of law.

Arizona R.S.Ct. 29(b)(9).

We believe that Respondent violated DR 1–102(A)(6) which provides that an lawyer shall not:

Engage in any other conduct that adversely reflects on his fitness to practice law.

It can be reasonably expected that a person trained as a lawyer will keep his books and records in such order as to not cast doubt on his competency and his hon-

esty. In the instant case, Respondent, by his slip-shod and sloppy accounting practices, did just that, and in doing so, raised questions on his fitness to practice law. We are, for example, most troubled by the manner in which he purchased items for personal use. Having a state agency pay for personal purchases and then reimbursing the agency is a risky business at best. Admittedly, Respondent did reimburse the District, but this does not excuse Respondent's conduct in using the state as a "credit card" for his personal purchases. We believe that this is the sort of conduct that can lead to trouble and is not acceptable conduct for an attorney in any capacity.

We find Respondent violated DR 1-102(A)(6).

## VII. SANCTION

Both the Committee and a majority of the Commission recommended that Respondent be censured.

■ The evidence showed that Respondent took a very serious, perhaps almost fanatic, approach to his substantive responsibilities as director. Because of the manner in which he approached his job, he had very little time and energy to devote to some of his administrative obligations. There can be little question that Respondent failed to maintain adequate contact with or supervision of these matters.

Because Respondent did not act with criminal intent, we believe, as did both the Committee and the Commission, that public censure is the appropriate sanction.

## VIII. COSTS AND EXPENSES

■ Respondent objects to the bar's statement of costs and expenses. The bar seeks reimbursement in the amount of $8,639.80 and has filed an itemized statement of costs. *See In re Davis,* 129 Ariz. 1, 4, 628 P.2d 38, 41 (1981). Respondent argues that since he was not found guilty of the more serious charges, any costs should be "drastically reduced" or not assessed at all. We note that the Bar Disciplinary Commission initially reacted to items reported by the press and others which indicated that Respondent was guilty of serious infractions of discipline involving felony criminal misconduct. Most of the efforts (and costs) of the committee was directed to these matters, which later proved to be unfounded. We have noted:

> The State Bar found Respondent guilty of four counts of unethical conduct and we agree with these findings. Although the State Bar submitted a very detailed itemized list of costs and expenditures, this list was not categorized by counts. We do not think, however, that categorization by counts is necessary. Respondent was found guilty of four ethical violations and is therefore responsible for costs and expenses incurred during this proceeding. *See in re Kleindienst,* 132 Ariz. 95, 644 P.2d 249 (1982) (attorney found guilty of two out of nine charges ordered to pay costs and expenses of the proceeding).... Rule 37(g), supra, does not expressly state that costs and expenses must be allocated to separate counts. We have reviewed the Bar's itemized list of costs and expenses and have determined that they were necessary and reasonable. We also believe that the Bar pursued the investigation of each count in good faith. The Respondent should pay the amount assessed.

*Matter of Riley,* 142 Ariz. 604, 616, 691 P.2d 695, 707 (1984).

That Respondent failed to keep good books and proper records is apparent, and this appears to have caused the initial complaint. We cannot say that Respondent should not be charged with payment of expenses in proving he was not guilty of the more serious allegations, when the more serious allegations were the direct result of Respondent's unprofessional and neglectful conduct.

The Respondent is censured and assessed costs in the amount of $8,639.80.

GORDON, C.J., and HOLOHAN and MOELLER, JJ., concur.

FELDMAN, Vice Chief Justice, concurring.

I write separately because I disagree with both the majority's characterization of respondent's conduct and its conclusion that he was not obligated to obey the specific commands of the Code of Professional Responsibility (the Code).

## RESPONDENT'S LEGAL OBLIGATIONS

Contrary to the conclusions of the Local Administrative Committee and the Disciplinary Commission, the majority holds that respondent was not answerable to the Code provisions requiring him to: (1) maintain records of his client's funds and properties; (2) render appropriate accounts to his client regarding such funds and properties; and (3) promptly pay or deliver to his client on request all such funds and properties in the lawyer's possession. *See* DR 9–102(B)(3) and (4). These provisions did not bind respondent because there was no putative client. At 452, 759 P.2d at 598. The court holds that these rules apply only to an attorney's "special obligation" to a traditional client. At 452, 759 P.2d at 598.

Respondent was employed and paid as a deputy county attorney during the entire time he served as director of the Arizona Drug Control District Strike Force. I cannot agree with the idea that respondent was a lawyer for purposes of receiving his salary but not a lawyer when it came to fulfilling ethical requirements. The majority badly misinterprets the two cases on which it relies in reaching its conclusion, *In re Neville*, 147 Ariz. 106, 708 P.2d 1297 (1985), and *In re Lurie*, 113 Ariz. 95, 546 P.2d 1126 (1976).

*Lurie* actually held that, although acting as a businessman rather than a legal adviser, the lawyer was bound to obey the specific disciplinary rule before us today. 113 Ariz. at 98, 546 P.2d at 1129. In *Neville*, dealing with a different section, we held

that the specific rules applied "also to transactions in which, although the lawyer is not formally in an attorney-client relationship with the adverse party, it may fairly be said that ... an ordinary person would look to the lawyer as a protector rather than as an adversary." 147 Ariz. at 111, 708 P.2d at 1302. Surely this principle applies most strongly to a lawyer holding public office to do the public's work. Certainly the public expects that a lawyer in public office will obey all the ethical requirements of the Code, in addition to the high standards inherent in public service. *Id.* at 112, 708 P.2d at 1303. *Neville* does not insulate respondent from the Code's specific obligations simply because he held public office.

These views are not an Arizona legal aberration. In other jurisdictions, lawyers involved in non-attorney-client relationships have been held accountable under specific sections of the disciplinary code.[1] *See, e.g., Libarian v. State Bar*, 21 Cal.2d 862, 136 P.2d 321 (1943) (specific rules regarding advertising applicable although advertisements were for nonlawyer services); *In re Genser*, 15 N.J. 600, 105 A.2d 829 (1954) (even though no attorney-client relationship, an attorney in a personal business transaction must comply with the ethical rules regarding an attorney's handling of funds entrusted to him).

As a leading commentator has noted, an attorney is "bound to observe the [ethical rules] as fully when he becomes president of the company as when he was its general counsel." H. DRINKER, LEGAL ETHICS 92 (1953). Not two years ago, this court espoused identical views. We said that a lawyer "does not cease to be bound by the ethical code merely because he is an officer ... of a company." *In re Kersting*, 151 Ariz. 171, 177, 726 P.2d 587, 593 (1986). Even when running for public office, an attorney is "bound by the ethical rules" requiring truthful statements. *Id.*, citing *State v. Russell*, 227 Kan. 897, 610 P.2d 1122 (1980).

**1.** *See generally* Annotation, *Disciplinary Action Against Attorney or Accountant for Misconduct Related to Preparation of Tax Returns for Others,* 81 A.L.R.3d 1140 (1977); Annotation, *Disciplinary Action Against Attorney for Misconduct Related to Performance of Official Duties as Prosecuting Attorney,* 10 A.L.R.4th 605 (1981); Annotation, *Misconduct in Capacity as Judge as Basis for Disciplinary Action Against Attorney,* 57 A.L.R.3d 1150 (1974).

## FACTUAL CHARACTERIZATION

In disciplinary proceedings against a member of the state bar, this court gives great weight to local committees' findings and conclusions. *Kersting.* Nonetheless, we have a duty to independently evaluate both fact and law. *Id.* at 172, 726 P.2d at 587; *Neville,* 147 Ariz. at 108, 708 P.2d at 1299. The majority finds in respondent's conduct no more than "slip-shod and sloppy accounting practices." At 453, 759 P.2d at 599. The record shows more.

Respondent was obligated to reimburse the county for all funds advanced to him and not expended in connection with his official duties. Expenditures, of course, were to be substantiated by appropriate receipts. Respondent failed to account and failed to return the funds for which he could not account. Because it was impossible to obtain respondent's cooperation, the appropriate county officials turned to respondent's supervisor, the Pima County Attorney.

Apparently quite properly perturbed at respondent's conduct, the county attorney told respondent's office staff "to collect and submit the necessary items." At 450, 759 P.2d at 596. Of course, he was aware that respondent had provided no vouchers to "collect and submit." He expected the staff to "reconstruct" the accounting by obtaining "dummy" vouchers, a practice which he believed had been followed "in the [Drug] Strike Force and throughout Pima County long before." RT at 380. A "dummy" voucher is one "not made at or near the time that the expense was incurred." *Id.* The county attorney expected the staff to provide substitute vouchers for expenses which had actually been incurred. *See* RT at 382. Evidently unknown to the county attorney, the administrative staff went beyond "dummy" vouchers and instead manufactured "phony" vouchers. While the former represent actual expenditures, the latter are false; they represent expenses not incurred at the place shown "or [which] had not been [incurred] at all." RT at 382.

The majority adopts the Committee's conclusion that there was "no dishonesty on the part of Mr. Grimble." At 452, 759 P.2d at 598. Yet, it admits that respondent knew that "blank receipts" were to be filled in and used in his accountings. The record also reveals that respondent verified the forms to which the false receipts were attached. *See* RT at 91, citing deposition of Donna Larsen, Strike Force Finance Administrator, at 40. At the very least, therefore, respondent verified vouchers, without any belief that the vouchers represented actual expenses. Even giving respondent the benefit of every doubt, at the least he condoned improper conduct. The unpleasant truth of the matter is that someone in this public agency knowingly submitted false documents to the county finance department, yet no one in the agency has been held responsible.

Even these transgressions are overshadowed by the use of state money for the purchase of personal items. Again, taking a rather rosy view of dismal facts, the majority adopts the Committee's finding that respondent "inappropriately took advantage of his official position to purchase property for his personal use with his client's funds, and although it was done without fraudulent or dishonest intent, it did result in inappropriate use of client funds as a source of personal credit for some period of time." At 451–452, 759 P.2d at 597–598. These kind words disguise serious misconduct. Respondent *admits* he purchased a desk for his personal use with state funds and by a state contract, thereby taking advantage of a state discount which would not have been available to him personally. This would have been improper behavior even if respondent had made immediate reimbursement to the state, but it is much worse because respondent not only acted without his supervisor's authority in doing this, but did not repay the state for this furniture for a period of many months, and then only after several demands had been made upon him.

The majority describes this as "risky business at best" that can "lead to trouble." At 453, 759 P.2d at 599. In my view, undisclosed use of public money to buy one's personal furniture is a little more than "risky business," especially when transacted by a law enforcement officer. If respondent's conduct on this point was

not theft, *see* A.R.S. § 13–1802(A)(2), it certainly comes close.

The record leaves many other points and questions flatly unresolved. I cannot agree with the majority's final conclusion that respondent's problems are attributable to his "serious ... approach to his substantive responsibilities [that resulted in a lack of] time and energy to devote to some of his administrative obligations." At 453, 759 P.2d at 599. Whatever those important responsibilities may have been, they simply do not excuse respondent's failure to account for public funds entrusted to him, his participation in submitting phony accountings or his use of state money to buy personal items. I therefore cannot accept the Commission's recommendation for censure and would remand to the hearing committee for further hearings to determine what respondent knew about the use of false vouchers and to answer other questions unresolved by this record. After such findings, this court could then accurately decide whether suspension or disbarment was the correct sanction. Believing, however, that some punishment is better than none, I reluctantly concur in the result.