In re David J. GLIMCHER, Debtor.

**Stronger Together Investments Limited Partnership, Debtor.**

**Wiz Holdings, LLC, Debtor.**

**GBB 315, LLC, Debtor.**

No. 2:11–bk–15333–RJH.

United States Bankruptcy Court, D. Arizona.

May 8, 2012.

Carolyn J. Johnsen, Jennings Strouss and Salmon PLC, Phoenix, AZ, for Debtor.

## OPINION RE: TURNOVER OF RETAINERS

RANDOLPH J. HAINES, Bankruptcy Judge.

The threshold issue here, and perhaps the *only* issue, is when does a retainer become the attorney's money instead of the client's. This matter comes before the Court on the Chapter 7[1] Trustee's Motion to Compel Turnover, and the response filed by Jennings, Strouss, & Salmon, P.L.C. ("JSS"). The Trustee has requested an order from the Court compelling turnover of the pre-petition retainers paid to both JSS and also the pre-petition retainer paid to Wright Tax Solutions ("Wright" or "Wright Tax Solutions").

Based on the following analysis, the Court finds and concludes that the pre-petition retainers paid to JSS and Wright were paid from pre-petition property of the Debtor, and to the extent that such property had not been applied pre-petition for services rendered pre-petition, the retainers became property of the bankruptcy estate once the voluntary petition was filed. Both JSS and Wright remained employed as professionals of the post-petition Chapter 7 Debtor, but neither was ever employed by the Chapter 7 bankruptcy estate. The retainers retained their char-

---

1. Except as otherwise indicated, all chapter, section and rule references are to the United States Bankruptcy Code, 11 U.S.C. §§ 101– 1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037.

acter as property of the estate, and neither JSS nor Wright had any authority to apply these pre-petition funds to pay for post-petition professional services rendered to the individual Debtor, and not to the bankruptcy estate. Accordingly, the Court finds that the Motion to Compel Turnover must be granted.

## Factual Background

Pre-petition, Debtor, David Glimcher, employed the professional services of JSS to represent and advise him, and to possibly act as Debtor's counsel if a bankruptcy petition might eventually need to be filed. In connection with this representation, Glimcher signed a retention letter and paid a pre-petition retainer of $40,000.00.[2] The $40,000.00 was paid via a check from the David J. Glimcher Company.[3] According to the retention letter's terms, "In the event it becomes necessary to proceed with a bankruptcy filing, it will be necessary [for Glimcher] to provide an additional $110,000." Further, the agreement indicated, "We will have the right to request additional advances from time to time based on our estimates of future work to be undertaken." The retainer was to be held in the JSS client trust account, and the agreement also provided: "We require that you pay our periodic invoices in full, although we may apply any of the retainer to your statements in our discretion at any time, all subject to Bankruptcy Court requirements." According to the declarations of Debtor's counsel, and of the Debtor himself, at the time JSS was engaged and the initial retainer was paid, it was not known if a bankruptcy petition would actually need to be filed, and a decision had not been made at the time of the engagement, if such a petition was eventually filed, whether it would be a Chapter 7 or a Chapter 11 petition.

Prior to the bankruptcy petition being filed, JSS received an additional $119,000.00. On May 25, 2011, JSS received a wire transfer from Wiz Holdings, LLC[4] directly into the JSS account in the amount of $60,000.00. On May 26, 2011, prior to the filing of the bankruptcy petition later that same day, JSS received a wire transfer from Wright Tax Solutions directly into the JSS account in the

---

**2.** David J. Glimcher states in his declaration that he tendered the check in the amount of $40,000.00 at the April 26, 2011 meeting with his prospective attorneys, JSS. Ms. Carolyn J. Johnsen states in her declaration that the firm received the check dated April 26, 2011 and deposited it into the JSS client trust account, and that the amount cleared on May 5, 2011. The retention letter authored by Ms. Johnsen is dated April 28, 2011; and the engagement and the terms of the letter were accepted by Glimcher. David Glimcher countersigned the retention letter on May 4, 2011.

**3.** JSS makes a point of informing the Court that the David J. Glimcher Company is a non-debtor entity. However, JSS does not purport to represent any of David Glimcher's entities, and its retainer agreement identifies David Glimcher as the only client. None of the entities opposed Trustee's motion for turnover. JSS does not dispute the Trustee's factual allegation in his reply that indicates that the Debtor owns 100% of the David J. Glimcher Company, and that upon the filing of the bankruptcy petition, the bankruptcy estate became the owner of that entity and the Chapter 7 Trustee is entitled to control the David J. Glimcher Company and its assets. Trustee also argues that if the Court were to order disgorgement of the pre-petition retainer, such disgorgement would come to the bankruptcy estate.

**4.** Again, Debtor's counsel makes a point of indicating that Wiz Holdings, LLC was a non-debtor entity. However, Wiz Holdings has been determined to be an alter ego of the Debtor and is a consolidated Debtor in this bankruptcy proceeding; the order entered by the Court on August 15, 2011 at Docket # 83, expressly granted *nunc pro tunc* relief for the Trustee's Motion to Consolidate. The order was effective as of May 26, 2011, and the order provides that May 26, 2011 shall constitute the order for relief under Chapter 7 as to Wiz Holdings, LLC.

amount of $59,000.00. In total, JSS received $159,000.00 pre-petition based on these three deposits. The money was held in the JSS client trust account.

Wright Tax Solutions apparently received $89,000 in cash (actual dollar bills) from David Glimcher on May 20, 2011.[5] Wright allegedly kept $30,000 of the cash paid for pre-petition work completed by Wright and wired $59,000.00 to Debtor's counsel, JSS on May 26, 2011.[6] Wright received an additional $25,000 from Glimcher. According to Ms. Johnsen's March 16, 2012 email, see footnote 5, supra, the $25,000 paid to Wright was paid on May 25, 2011 from Wiz Holdings, LLC and was paid as a retainer for services for Wiz Holdings, LLC, and not on behalf of David Glimcher.[7]

Trustee filed a Motion to Compel Turnover seeking return of the pre-petition retainers paid by the Debtor to JSS and to Wright Tax Solutions.

JSS filed a response to the motion, and argues that the retainer it received was not property of the bankruptcy estate because what JSS received was an "advance payment retainer." Further, JSS argues that even if the retainer were property of the bankruptcy estate, it should neverthe-less be entitled to offset its fees against the retainer because JSS performed services at the Trustee's request that benefitted the bankruptcy estate. JSS argues that the pre-petition retainers received by JSS were from three different sources and the funds were all commingled in JSS's client trust account. The retainers were commingled and the funds are not susceptible to tracing; as such, the Trustee cannot identify if the "balance" remaining constitutes funds from the Debtor or the non-Debtor entities.[8] Finally, JSS argues that the retainer received was reasonable because at the time of the retention agreement, it was not known if a bankruptcy petition would be filed, and the agreement provided for additional funds if a bankruptcy were indeed filed, and the determination of whether to file a Chapter 7 or Chapter 11 case was not decided until the end of May, 2011. The amount of the retainer paid to JSS was reasonable due to the size and complexity of this case.

Wright Tax Solutions did not file a response to the motion and did not appear at the hearing held on April 23, 2012. At that hearing, Ms. Johnsen specifically stated that she did not officially represent Wright at that time, but Ms. Johnsen stat-

5. The account of how much money was received by Wright Tax Solutions was detailed in a series of emails between Ms. Johnsen to Trustee's counsel sent on March 15–16, 2012. Trustee's counsel attached the email exchange as Exhibit B attached to his reply.

6. The Court notes that the March 16, 2011 email from Ms. Johnsen seems to track with the account provided in the declaration of Ricky Wright for Wright Tax Solutions—the declaration is dated March 27, 2012. According to Ms, Johnsen, "On May 20, 2011, [Debtor] deposited $89,000 in cash with Wright Tax Solutions; Wright kept $30,000 to offset prepetition work and wired $59,000 to JSS." According to Mr. Wright, "On May 26, 2011, prior to the filing of this proceeding that same day, Wright received $30,000 from the Debtor." Wright's declaration includes a footnote

that explains that the monies received from the Debtor were in cash deposited initially in Wright's trust account and then $30,000 was applied to Wright's prepetition services and $59,000 was wired to the JSS account.

7. The Court notes that Ricky Wright's declaration makes no mention of the $25,000.00 received as a retainer for Wiz Holdings, LLC.

8. The Court notes that it is clear from JSS's response and the exhibits attached thereto that the initial $40,000.00 was paid by David J. Glimcher Company via the check dated April, 26, 2011; the next $60,000.00 was paid by Wiz Holdings via wire transfer on April 25, 2011; the final $59,000.00 was paid by Wright Tax Solutions via wire transfer on April 26, 2011.

ed the issues are intertwined so she wanted to make some comments on Mr. Wright's behalf. Ms. Johnsen commented that the Trustee raised in his reply for the first time the issue of possible preferential payments for both JSS and Wright concerning payments received on the petition date and applied to pre-petition services rendered. Further, Mr. Wright had not had time to obtain counsel as of the time of the hearing.

## Analysis

### A. Types of Retainers

 First, there are basically two types of retainers: retainers that are earned upon receipt, and retainers that are held to secure payment of future legal fees. Of the retainers that are earned upon receipt, there is the classic non-refundable retainer and there is the advance payment, which is sometimes called a "flat fee retainer." Provided the overall fee is reasonable, it is ethically permissible under the Arizona Rules of Professional Conduct[9] to charge a flat fee retainer or a classic non-refundable retainer.[10] The common element of both of these retainers is that they are actually earned upon receipt because once the client pays the retainers, the client no longer has an interest in the retainer and all interest immediately transfers to the attorney.[11]

 The retainer that is held by the attorney to secure payment of future legal fees, sometimes called a "security retainer," is different from an earned-upon-receipt retainer because the money remains property of the client, even if it is held by the attorney.[12] Such retainers must be placed in the attorney's client trust account according to the Arizona ethical rules.[13] In contrast, an earned-upon-re-

---

**9.** The Arizona Rules of Professional Conduct may be found at Rule 42 of the Rules of the Supreme Court of Arizona. Rule 42 provides:

> The professional conduct of members [of the State Bar of Arizona] shall be governed by the Model Rules of Professional Conduct of the American Bar Association, adopted August 2, 1983, as amended by this court and adopted as the Arizona Rules of Professional Conduct.

Rule 42 is then divided into individually numbered ethical rules, with accompanying comments to the rules. These rules are hereafter cited as "Arizona Ethical Rule," "Ethical Rule," or "ER."

**10.** Arizona Bar Ethics Op. 10–03 (June 2010); *see also* Arizona Bar Ethics Op. 99–02 (April 1999).

**11.** The transfer is complete when it is received by the attorney, even if there is a possibility that at some later point in time the attorney might be required to refund a portion of the already earned retainer. Two examples of when an attorney who has received a non-refundable retainer might be required to return a portion of the retainer would be if the attorney in fact did not do the work contemplated, or if the retainer was unreason-

able. *See In re Hirschfeld,* 192 Ariz. 40, 960 P.2d 640, 643–44 (1998); *In re Swartz,* 141 Ariz. 266, 686 P.2d 1236, 1242 (1984); Arizona Ethical Rule 1.5; and 11 U.S.C. § 329(b).

**12.** Under the Secured Transactions portion of Uniform Commercial Code, as adopted in Arizona by Arizona Revised Statutes ("A.R.S.") §§ 47–9101—47–9709, in order to perfect a security interest in money, the attorney must take possession of the money. A.R.S. § 47–9312(B)(3) and 47–9313(A). However, merely taking possession of the client's money for purposes of perfecting a security interest to secure future earned fees, or otherwise, does not effect a transfer of the ownership in the money. As provided by Arizona Ethical Rule 1.15 and Rule 43(a) of the Rules of the Supreme Court of Arizona, it is contemplated that a lawyer can and will take possession of *the client's property, including money of the* client, and that the lawyer is required to properly safeguard such property that remains property of the client.

**13.** Arizona Ethical Rule 1.15(a) ("A lawyer shall hold property of [a] client[ ] ... that is in a lawyer's possession in connection with a representation separate from the lawyer's

ceipt retainer may not be placed in the attorney's client trust account because those funds are the property of the attorney, and it is unethical for an attorney to commingle the attorney's money with client trust funds.[14]

### B. The Type of Retainers in This Case

█ Jennings Strouss contends that its retainer was an "advance payment retainer," a rather ambiguous and uninformative label because all retainers are advance payments of some kind. The Jennings Strouss' position is clarified by the declaration of attorney Carolyn Johnsen, who declared under penalty of perjury that "It was my intention that the Retainer would be an advance payment retainer for fees and that the Debtor would not retain an interest in it." If the Debtor was to have no interest in the retainer immediately on its payment, this would necessarily imply the retainer was fully earned upon receipt and immediately became the law firm's money.

But the firm's position is belied by the terms of the retainer agreement itself, which does not describe an earned-upon-receipt retainer. To the contrary, the retainer states: "Our fees will be based primarily on the [hourly] billing rate for each attorney and legal assistant devoting time

own property.") and Arizona Ethical Rule 1.15(c) ("A lawyer shall deposit into a client trust account legal fees and expenses that have been paid in advance, to be withdrawn by the lawyer only as fees are earned or expenses incurred.")

14. The Court recognizes there appears to be four *very limited* exceptions when a lawyer is permitted to place funds belonging to the lawyer or the law firm into the client trust account under Arizona Ethical Rule 1.15 and Rule 43(a) of the Rules of the Supreme Court of Arizona. Those exceptions are: 1) funds to pay service or other charges imposed by the financial institution related to the operation of the trust account; 2) funds to pay merchant fees or credit card transaction charges, or to

to this matter." That unmistakably implies that the fees were neither determined nor earned immediately upon payment of the retainer, but to the contrary would be determined and earned only as the hours are worked. This is confirmed by the provision that additional retainers could be required in the event more hours needed to be worked: "In the event it becomes necessary to proceed with a bankruptcy filing, it will be necessary to provide an additional $110,000. We will have the right to request additional advances from time to time based on our estimates of future work to be undertaken."

The retainer agreement also makes clear that the funds remained the client's trust funds until the hours were worked, the fees were billed and the retainer applied to such invoices:

> We will hold the retainer in our Trust Account. We require that you pay our periodic invoices in full, although we may apply any of the retainer to your statements in our discretion at any time, all subject to Bankruptcy Court requirements.
>
> At the conclusion of the engagement, and after payment of all of our fees and expenses, we will return to you, without interest, any unused portion of the retainer. Please note that the retainer is

offset debits for credit card chargebacks; 3) earned fees and funds for reimbursement of costs or expenses, but only if they are part of a single credit card transaction that also includes the payment of advance fees, costs or expenses, and any such earned fees and funds for reimbursement of costs and expenses must be withdrawn from the trust account within a reasonable time after deposit; and 4) funds belonging in part to a client or third person and in part presently or potentially to the lawyer or law firm, but the portion belonging to the lawyer or law firm must be withdrawn when due and legally available from the financial institution, or within a reasonable time thereafter, unless the right of the lawyer or law firm to receive it is disputed. None of these exceptions is relevant here.

not an estimate of the anticipated cost of our services.

Those provisions are dispositive and determinative that the retainer remained the client's money until future work was performed and billed, and the retainer applied. Moreover, there would be serious ethical problems with Ms. Johnsen's position that the retainer was earned upon receipt and the client retained no interest in the funds.

First, Arizona Ethics Opinion 99–02[15] clearly requires that the fee agreement explicitly state that a prepaid fee is nonrefundable or earned upon receipt, and must do so clearly, "in terms intelligible to the client." This Ethics Opinion cites a number of authorities holding that in the absence of such specific language, the retainer is not earned upon receipt and must instead be treated as a client's property and must be held in the client trust account. Here, there is no such explicit and clear language defining how or why the retainer was non-refundable or earned upon receipt. "In order to comply with the ethical rules, the attorney must explicitly describe what justifies treating all or a portion of the flat fee as non-refundable or 'earned on receipt.'"[16]

Second, if the retainer were earned upon receipt, then both Arizona Ethical Rule 1.5(b) and Arizona Ethics Opinion 99–02 require that the basis or rate of that fee must be communicated in writing to the client. Nothing in the Glimcher retainer agreement explains how Jennings Strouss could have been deemed to have earned a flat-fee in the amount of the retainer even before the work was done. It does not, for example, explain that the retainer is nonrefundable because the representation would require the firm to decline other work due to conflicts or time commitments.

Third, the retainer agreement expressly provided that the funds would be placed in the Jennings Strouss client trust account, as in fact they were. This would be an ethical violation if the funds in fact belonged to Jennings Strouss, because that would mean that the firm's own money was being commingled with clients' trust funds. This is made clear by both Arizona Ethical Rule 1.15(a)[17] and Arizona Ethics Opinion 99–02.[18]

As Arizona Ethics Opinion 99–02 provides, "[T]he client's agreement with the lawyer determines whether prepaid funds are earned on receipt—and therefore the property of the lawyer—as opposed to an advance against future fees that must be held in trust." Here, the client's agreement with the lawyer unmistakably determined that the prepaid funds were not earned on receipt, and were therefore an advance against future fees that remained the client's property.

C. Security Retainers for Chapter 7 Debtors May Not be Retained or Drawn On.

█ As suggested above, this threshold determination that the retainer was a security retainer rather than an earned upon receipt fee is also effectively the dispositive determination, at least when that conclusion is considered in the context of governing Supreme Court precedents such as *Whiting Pools*[19] and *Lamie.*[20] *Whiting*

15. Arizona Bar Ethics Op. 99–02 (April 1999).

16. *Id.*

17. "A lawyer shall hold property of clients ... separate from the lawyer's own property."

18. "A nonrefundable fee becomes the property of the lawyer when paid. Such funds should not be placed in a trust account where they will commingle with client funds. E.R. 1.15(a)."

19. *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983).

*Pools* leaves no room for debate that when the IRS or a law firm holds only a security interest and physical possession, the property securing it remains property of the estate and therefore subject to turnover. And *Lamie* leaves no room for debate that a Chapter 7 debtor's attorneys cannot be paid from the estate unless they are employed by the Trustee and such employment is approved by the court.

This case is on all fours with the holding and analysis in *Blackburn:*[21]

> Permitting debtor's attorneys not employed under § 327 to draw upon prepetition security retainers for chapter 7 fees would significantly undermine § 330 and the *Lamie* decision. Security retainers are estate property. By drawing upon such retainer for chapter 7 services, debtors' attorneys would be receiving compensation from the estate without having been employed under § 327 and their fees approved under § 330 or § 331—in clear contradiction of the rule articulated in *Lamie.*[22]

■ Most of Jennings Strouss' response consists of arguments and facts to the effect that Jennings Strouss rendered substantial services post-petition, that the services benefitted the estate and were often specifically requested by the Trustee, and that its fees for these services were reasonable, especially in light of the complexity of the estate. While the Trustee does not dispute the reasonableness of the fees for the work performed, he responds that he never employed Jennings Strouss, and that requests for the Debtor to provide

information were made to Debtor's counsel only because that was ethically required when the request came from Trustee's counsel, Mr. Dake.[23] But the arguments that the fees were reasonable and the services benefitted the estate are essentially irrelevant because nothing in Bankruptcy Code §§ 327, 329 or 330 permits a Chapter 7 debtor's attorney to be compensated by the estate unless also employed by the estate.

*Lamie* does not recognize an uncodified quantum meruit exception. Nor does it recognize a so-called "retainer exception" that is applicable to security retainers. The language of the *Lamie* opinion that is the alleged source of the "retainer exception"—"Section 330(a)(1) does not prevent a debtor from engaging counsel before a Chapter 7 conversion and paying reasonable compensation in advance to ensure that the filing is in order."—clearly refers to an earned-upon-receipt flat fee payment, rather than a security retainer. This was the clear analysis and holding in Blackburn and the numerous authorities cited therein.[24] This Court agrees with that analysis and holding.

### Conclusion

For these reasons, the Trustee's motion for turnover must be granted. Because the Wright retainer was no different in form from the Jennings Strouss retainer and no different argument or defense was raised on its behalf, the Trustee's motion must be granted as to both Jennings Strouss and Wright. Trustee's counsel is

---

20. *Lamie v. U.S. Trustee,* 540 U.S. 526, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004).

21. *In re Blackburn,* 448 B.R. 28, 37–38 (Bankr.D.Idaho 2011).

22. *Id.* at 38.

23. Arizona Ethical Rule 4.2 ("Communication with Person Represented by Counsel").

24. Amazingly, despite the clear analysis and holding in *Blackburn,* Jennings Strouss cites *Blackburn* as authority for its statement: "In interpreting *Lamie,* bankruptcy courts have held that Section 329 allows attorneys to apply prepetition retainers to post-conversion attorneys' fees."

requested to upload a form of order requiring turnover of all funds held in the respective retainer accounts as of the petition date, less any amounts subsequently invoiced for pre-petition work[25] that had not been drawn or paid by the petition date.

**25.** The Court notes that the underlying facts presented to this Court concerning the pre-petition retainers paid by David Glimcher included a copy of the March 16, 2012 email from Ms. Johnsen to Trustee's counsel. Pursuant to that email, Ms. Johnsen, in explaining the source and purpose for various payments made pre-petition indicated that Wright Tax Solutions received a payment of $25,000 via a wire transfer on May 25, 2011 from Wiz Holdings as a retainer for services for Wiz Holdings. The Court also notes that pursuant to an order entered on August 15, 2011, this Court consolidated the Wiz Holdings, LLC into this Chapter 7 bankruptcy proceeding, and that order granted *nunc pro tunc* relief making the consolidation effective May 26, 2011. Further, the August 15, 2011 order established that the date of the order for relief in the Wiz Holdings LLC Chapter 7 was May 26, 2011.